THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. COLUMBUS McGEE, Defendant-Appellant.

First District (4th Division)    No. 1—95—0221

Opinion filed February 20, 1997.

Robert Agostinelli and Ronald Packowitz, both of State Appellate Defender's Office, of Ottawa, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Owen D. Kalt, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

Columbus McGee (McGee) was tried before a jury on a charge of first-degree murder for the shooting of Tyree West. He admitted the shooting, but claimed he acted in self-defense. He was found guilty and sentenced to 55 years' imprisonment.

The issues in this case concern the various ways McGee's believability as a witness was attacked by the prosecution. Four prior felony convictions were admitted against him, and the prosecution's cross-examination of the defendant included questions about his repeated commission of other crimes, his association with "robbers and murderers," and his use of an alias to stay out of jail.

We reverse the defendant's conviction and remand the case for a new trial.

FACTS

At trial, 24-year-old Carice West testified that, two years earlier, on August 26, 1992, he and his brother, Tyree West, visited Tyree's girlfriend, Vivian Clifton. Clifton lived in an apartment at the corner of Central Park Avenue and Thomas Street in Chicago. After eating dinner and watching TV, Carice and his brother left Clifton's apartment sometime around 6:30 p.m. to go to a grocery store to get

cigarettes. The grocery store was located a few blocks away at Augusta and Ridgeway.

When leaving the grocery store, Carice noticed a Chevy Malibu car with four black men inside. The men pointed toward Carice and Tyree. As Carice and Tyree walked east on Augusta, going back to Clifton's apartment, they heard shots being fired and turned to see a black man shooting at them. Carice and Tyree ran into an alleyway, over to Monticello Street, then back to Augusta, and then to Central Park Avenue. On Central Park Avenue, as they approached Clifton's apartment, they saw a black man, whom Carice later identified as Columbus McGee, standing on the corner, wearing dark pants and a blue sweater. Tyree shouted that the man had a gun. Carice and Tyree began to run and McGee started shooting.

As Carice and Tyree ran, Tyree said that he had been hit. Carice helped Tyree into a gangway and then ran back to Clifton's apartment to call for help. The police and an ambulance responded, and Tyree was taken to Mt. Sinai Hospital, where he later died from a single gunshot wound to the back.

Carice further testified that, three days later, on August 29, 1992, he picked McGee's picture from a group of photographs and identified him as the man who shot Tyree. He did not know McGee and had never seen him before the shooting. On October 7, 1992, Carice witnessed a lineup at the police station and again identified McGee as the shooter.

John Butler, a forensic investigator for the Chicago police, testified that on August 26, 1992, in the course of his investigation of the shooting, he recovered three .38 automatic cartridge cases from the ground near 1058 North Central Park Avenue and three 9 millimeter NNY Luger cartridge cases from the ground at the northwest corner of the intersection at Augusta and Ridgeway.

Detective Joseph Walsh of the Chicago police department testified that he had been assigned to investigate the shooting of Tyree West and became aware that McGee was wanted for questioning. He learned that McGee was on probation and had an appointment scheduled. Walsh and his partner went to the probation office to speak to McGee. McGee did not keep the appointment.

Later, on the evening of October 6, 1992, the police received a tip concerning McGee's whereabouts. Based on the information received, Walsh, along with several other officers, went to an apartment at 1007 Monticello Avenue. When the officers knocked, a woman opened the door to the apartment and said that McGee was not home. She allowed the officers to enter the apartment to look for McGee. Walsh's partner, Detective Whalen, discovered McGee hiding behind some

clothes in the bedroom closet. He was arrested and taken to the police station.

Detective Keane, who also was at the apartment, discovered a gun "clip" containing a single live round or bullet. This was discovered between the mattress and box spring in one of the bedrooms inside the apartment.

Detective Keane also testified that he spoke with McGee in an interview room at the police station following his arrest. After advising McGee of his rights, McGee made several statements. First, McGee stated that he had gone to a store at Monticello and Augusta with his daughter, that two men followed him from the store, and that he shot at these men out of fear for his own life. Next, McGee admitted that he was not with his daughter, but he claimed that two men approached him on the street and that he shot at them because he was in fear for his own life.

In his third statement, which he said was "the truth," McGee said that he had gone to the store at Monticello and Augusta with his girlfriend. His girlfriend, he claimed, told him that two men who had been in the store earlier wanted to rob him. McGee left the store and got into a car with three other black men. They drove down Augusta and he pointed out two guys walking down the street. At Augusta and Ridgeway, McGee and one of the other men in the car, named "Little June," jumped out of the car and fired shots at the two men. Little June used a Tech 9 semi-automatic pistol and McGee used a .38 semi-automatic pistol. The two men ran off. McGee and Little June got back into the car and took off after the two fleeing men. At Monticello Avenue, McGee jumped out of the car and ran toward Central Park Avenue. As McGee stood on the southwest corner of Thomas Street and Central Park Avenue, he saw the two men running toward him on Central Park Avenue. When the men saw him, they turned around and started to run away. They were unarmed. McGee fired three shots at them, then left the area.

After obtaining McGee's statement, Detective Keane called an assistant State's Attorney (ASA). ASA Earl Grinbarg came to the station and met with McGee. McGee told Grinbarg the same story he had told to Detective Keane about how the shooting occurred, the third version. McGee told ASA Grinbarg that he would sign a written statement, but after Grinbarg wrote out McGee's statement, McGee refused to sign it.

McGee was the only witness to testify for the defense. First, he admitted that he had prior convictions for robbery, aggravated battery, manufacture and delivery of a controlled substance, and possession of a controlled substance. Then McGee told about an incident

that occurred on July 23, 1991, when he was shot in the face. He said that he had been in an alleyway with a friend when two men came up to them and put a gun to his head. He grabbed the gun and it discharged in his face. McGee had to be treated in the hospital for more than two months and remained permanently disfigured. A plate was inserted in his jaw to replace a shattered jaw bone and his speech was affected because his tongue was mutilated. This event, McGee claimed, caused him to become so fearful that he started carrying a gun.

After this preliminary testimony, McGee told his version of what happened on August 26, 1992. He did not deny shooting Tyree West, but claimed that he did so in self-defense.

He said that he was in the grocery store at Monticello and Augusta with his girlfriend. After a conversation with his girlfriend, he gave her $2,000, bond money he had just gotten back from Cook County, to hold for him. McGee then started to walk to McDonald's to get some food.

At the intersection of Thomas Street and Central Park Avenue, McGee heard someone say, "Nigger, blow that shit." He turned around and saw two men, later identified as the West brothers. He claimed that Tyree pulled out a gun, slapped him, and demanded his gold chain. He took off the chain and gave it to Tyree. Then Tyree threatened him and told him to leave the area.

McGee turned as if to leave but pulled out his own gun. He turned back around and directed a woman, who had gotten in the way, to move. McGee claimed that Tyree and Carice heard him tell the woman to move and turned around. Tyree then pointed his gun at McGee and McGee fired. McGee said that, after he fired one shot, the brothers turned to run away. He fired two more shots as they ran. McGee admitted that he disposed of the gun in the sewer after the shooting.

In accord with defendant's theory of defense, the jury was given instructions on self-defense and second-degree murder based on imperfect self-defense.

## DECISION

### 1. Admission of Defendant's Prior Convictions

The most troubling issue in this case concerns the trial judge's denial of the defendant's motion to exclude three of his four prior felony convictions. The State proposed to offer the convictions to impeach the defendant's credibility should he take the stand.

The defendant had been convicted of aggravated battery, posses-

sion of a controlled substance, manufacture and delivery of a controlled substance, and robbery. The defendant does not seriously challenge use of the robbery conviction, but contends the other three convictions should not have been admitted to impeach him.

For tactical reasons, McGee revealed his prior convictions during his direct testimony. Given the trial judge's pretrial ruling, he was not required to wait for cross-examination. He may and does argue that he was unfairly prejudiced by the trial court's ruling. He contends the prior convictions had no bearing on his testimonial credibility but served only to inform the jury he was a bad person.

Any discussion of the admissibility of prior convictions for impeachment purposes necessarily begins with *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971).

■ In *Montgomery* our supreme court adopted the 1971 proposed version of Federal Rule of Evidence 609:

> "(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime, except on a plea of *nolo contendere*, is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement regardless of the punishment, unless (3), in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice." 47 Ill. 2d at 516.

Section (b) of the proposed rule established a permissible age limit for the convictions. Age of the convictions is not an issue in this case.

The 1971 version of Rule 609 never went into effect. Federal Rule 609, as enacted in 1975, differs in some ways from the proposed rule, but our supreme court remains committed to the 1971 proposal. Any doubt about that was laid to rest in *People v. Yost*, 78 Ill. 2d 292, 295, 399 N.E.2d 1283 (1980):

> "It was not the court's intention that the standards for impeachment announced in *Montgomery* would be changed from time to time to correspond to whatever changes might be subsequently proposed for Federal Rule 609."

*Montgomery* adopted the balancing test, or weighing process, envisioned by the proposed rule. The prior conviction would be excluded where the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

The importance of the balancing test was underscored in *Montgomery* when the court quoted the Advisory Committee's reference to the test as "the most significant feature of the rule." *Montgomery*, 47 Ill. 2d at 517.

Trial judges were told to consider such factors as: "the nature of the crime, nearness or remoteness, the subsequent career of the person, and whether the crime was similar to the one charged." *Montgomery*, 47 Ill. 2d at 518.

We have described the impact of *Montgomery*:

> "A balance had to be struck. A figurative scale was drawn. On one side of the scale the trial judge was to place the probative value of the prior conviction. That is, the judge must consider the relevance of the prior conviction to an evaluation of the defendant's credibility as a witness. On the other side of the scale, the trial judge was to place all the factors that could result in unfair prejudice to the testifying defendant." *People v. Elliot*, 274 Ill. App. 3d 901, 906, 654 N.E.2d 636 (1995).

This case was tried before either of the *People v. Williams* cases decided by the supreme court and discussed at length by the parties.

In *People v. Eddie Williams*, 161 Ill. 2d 1, 641 N.E.2d 296 (1994), the court considered the impeachment of the defendant in a murder case with evidence of a voluntary manslaughter conviction. Finding error, although harmless, the court criticized the "increasingly mechanical application" of the "rationale that a felony of any type evinces a disrespect for societal order and thus adversely affects the defendant's veracity." *Williams*, 161 Ill. 2d at 39. The court then said:

> "The *Montgomery* rule does not, however, allow for admission of evidence of any and all prior crimes. The focus of *Montgomery* was on crimes which bear upon the defendant's truthfulness as a witness." *Williams*, 161 Ill. 2d at 39.

Some appellate courts took the *Eddie Williams* decision to mean a prior conviction should not be placed on the balancing scale unless it has something to do with the defendant's testimonial believability, rather than merely reflecting disrespect for social order. See, for example, *Elliot*, 274 Ill. App. 3d at 908-09.

Social order offenses gained back their place on the scale less than two years later in *People v. Frank Williams*, 173 Ill. 2d 48, 670 N.E.2d 638 (1996). There, the court said it did not intend to exclude from the weighing process a felony conviction that evinces disrespect for social order.

What matters, said the *Frank Williams* court, is that the trial judge understand and use the *Montgomery* balancing test—whether the probative value of the evidence of the prior crime is substantially outweighed by the danger of unfair prejudice. Further, it is not necessary that the trial judge "explicitly state that he was balancing the opposing interests." *Williams*, 173 Ill. 2d at 83. It is enough that

"there is no reason to suppose that he disregarded the familiar, well-established *Montgomery* standard in determining that the impeachment was proper." *Williams*, 173 Ill. 2d at 83.

■ The trial judge in this case understood he was dealing with a *Montgomery* issue. He knew he had discretion to exclude the convictions. He concluded the lack of similarity between the murder charge being tried and the prior convictions obviated the danger of the jury saying "well, he did that same crime before, so he will do it again."

But then the trial judge said:

> "It is my experience that in assessing the question of credibility a person's background, be it good, bad or indifferent, is something the jury should be allowed to consider."

Our concern is that the required weighing process ended once the trial judge determined the prior convictions were not similar to the charge being tried. That is what he seemed to be saying. If so, proper consideration was not given the *Montgomery* balancing test.

Given the *Frank Williams* decision, we conclude the trial court did not err when it placed the two drug convictions on the scale, even though the rationale for use of that kind of crime has been a defendant's "disposition to place the advancement of individual self-interest ahead of principle or the interest of society." *People v. Nelson*, 31 Ill. App. 3d 934, 938, 335 N.E.2d 79 (1975). And while we have difficulty seeing the evidentiary value of an aggravated battery conviction in this case, we note that aggravated battery was the prior conviction used for impeachment in the *Frank Williams* murder case.

We believe, however, the trial court's remarks indicate it did not conduct a meaningful balancing test. Once the judge found dissimilarity of offense, the process stopped. No further weighing took place. "Good, bad, or indifferent background" is not the key to admission. Because the trial judge failed to weigh probative value against unfair prejudice, error was committed. We do not express any view on which way the scale should tilt. That is an area for the exercise of the judge's discretion, subject, of course, to our review. All we say at this time is that he must exercise that discretion.

Standing alone, the failure to weigh might not result in reversible error, but given the prosecution's excessive and unfair attacks on the defendant's character, in a case where the defendant's believability was in issue, we hold a new trial is warranted.

2. The Prosecutor's Questions and Remarks

■ It is true, as the State observes, the questions and remarks the defendant complains of were not specifically included in a post-trial

794

motion. Nor was contemporaneous objection made to some of them. Ordinarily, we would find the issues waived. *People v. Coleman*, 158 Ill. 2d 319, 633 N.E.2d 654 (1994). However, these instances were part of a continuing attack on the defendant's character which, when taken with the failure to conduct a proper *Montgomery* balancing test, deprived the defendant of a fair trial. See *People v. Pitsonbarger*, 142 Ill. 2d 353, 402, 568 N.E.2d 783 (1990).

We summarize the instances of improper questions and comments.

(a) The Prosecutor Asked the Defendant a Series of Questions About Criminal Conduct Unrelated to the Issues at Trial

■ The defendant testified on direct examination that, after someone shot him in the face in July 1991, he began carrying a gun to protect himself. The evidence was admitted to show defendant's state of mind when he shot Tyree West. On cross-examination, the prosecutor asked:

"Q. Now at that point you had already been convicted of the felony offense of robbery, aggravated battery, delivery of a controlled substance, is that correct?
A. Yes.
Q. Were you a convicted felon?
A. Yes.
Q: Correct?
A. Yes.
Q. And carrying a weapon for a convicted felon?
[Defense counsel:] Objection, judge.
[THE COURT:] Overruled.
Q. All right. The mere fact that you carry a weapon as a convicted felon is a felony offense itself. Now, you know that?
A. Yes.
Q. What was called felony unlawful use of weapon, correct?
A. Yes.
Q. Every day that you walk out that house with that gun you were committing a felony, is that correct?
A. Yes.
Q. How many of those days after you say you were shot in the face did you continue to carry a gun?
A. I started carrying the gun in around springtime of 1992."

The erroneous admission of other crimes evidence carries a high risk of prejudice. *People v. Lindgren*, 79 Ill. 2d 129, 402 N.E.2d 238 (1980). The danger is the evidence will overpersuade the jury, causing it to convict the defendant because of feelings he is a bad person deserving punishment rather than on the basis of the facts related to

the offense being tried. *People v. Spiezio*, 105 Ill. App. 3d 769, 771, 434 N.E.2d 837 (1982) (reversible error to admit evidence of auto theft in burglary case).

In this case, evidence that the defendant might have been committing a weapons felony every day for more than two years bore no relevance to the murder charge being tried. Much like the prosecutor's repeated use of the terms "mug shot" and "mug book" in *People v. Graham*, 179 Ill. App. 3d 496, 534 N.E.2d 1382 (1989), the only purpose of the evidence was to unfairly prejudice the defendant in the minds of the jurors.

(b) The Prosecutor Asked the Defendant Questions About His "Associates"

■ During his direct examination, the defendant testified to disposing of the weapon he used to shoot Tyree West and later calling a lawyer. On cross-examination by the prosecutor:

"Q. What sort of people tell you that when you shoot somebody you get rid of the gun?
[Defense counsel:] Objection.
THE COURT: Overruled.
A. Robbery, murderer.
Q. I am sorry.
A. I said, robbery, murderer, people I know, just people.
Q. Friends of yours, robbers and murderers, people, friends of yours?
A. No, associates.
Q. Now, these robbers and murderers, associates of yours, are they the ones that told you that you should ask for a lawyer when you are questioned by police?
A. Yes."

A defendant should be able to exercise his sixth amendment right to counsel without deprecation or belittlement, *People v. Meredith*, 84 Ill. App. 3d 1065, 405 N.E.2d 1306 (1980). These questions represented an unwarranted attack on the defendant's decision to contact a lawyer. Standing alone, the questions would not rise to the level of reversible error. We do not, however, consider them in isolation.

(c) The Prosecutor Extensively Examined the Defendant About His Use of an Assumed Name in Another Case

■ Faced with the trial judge's ruling on the admissibility of prior convictions, the defendant testified on direct to his criminal record. He said he was the "same Columbus McGee who also used the name of *** Willie Killerese *** who on July 1st, 1992, was found guilty of the offense of possession of a controlled substance." The prosecutor

used that opportunity to ask several questions that far exceeded the scope of the direct examination and that entered territory having nothing to do with the limited purpose for admission of the prior convictions:

"Q. Why did you use the name Willie Killerese, sir?

A. Because I was on parole and I was scared that I was going to get locked up. I wasn't going to be able to get out.

Q. Scared again? Now, your correct name is Columbus McGee, is that true?

A. Yes.

\* \* \*

Q. Is that the case you got the probation on, the last case?

A. Yes.

Q. Because you changed your name to Willie Killerese?

[Objection overruled.]

Q. You changed your name from Columbus McGee to Willie Killerese hoping that you might get probation and not get your parole violated, is that right?

A. Yes.

Q. So you lied?

A. Yes."

The use of an assumed name during a prior arrest had nothing to do with the shooting of Tyree West. The prior conviction came in for the limited purpose of attacking testimonial believability. The defendant made no attempt on direct examination to explain either his prior conviction or the use of the false name. Evidence of the use of an alias is admissible "only if material to some issue in the case." *People v. Coleman*, 158 Ill. 2d 319, 339, 633 N.E.2d 654 (1994).

It is true that the defendant's credibility became an issue in the case. But in this state, specific instances of untruthfulness are not admissible to attack a witness's believability. *People v. West*, 158 Ill. 2d 155, 632 N.E.2d 1004 (1994); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 608.5 (6th ed. 1994).

The prosecutor's questions went too far. And the theme was picked up again during the prosecution's rebuttal argument: "he has just lied to the judge to get on probation, lied about his name, lied to stay out of prison."

None of these instances of prosecutorial excess would, individually, result in reversal given the evidence in this case. We view them in conjunction with the trial court's failure to conduct a proper *Montgomery* weighing test. While the evidence was sufficient to support the first-degree murder verdict, we note that the jury also was instructed on self-defense and second-degree murder. The jury was

entitled to weigh the defendant's believability on those issues without being deterred by improper considerations. Basic fairness requires no less.

CONCLUSION

For the reasons stated, we reverse the defendant's conviction and remand this cause for a new trial.

Reversed and remanded.

McNAMARA and CERDA, JJ., concur.