THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SOTIRIOS GEORGAKAPOULOS, Defendant-Appellant.

First District (2nd Division)   No. 1—97—2537

Opinion filed March 16, 1999.—Rehearing denied April 14, 1999.

1002

Michael J. Pelletier and Michael H. Orenstein, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Romano D. DiBenedetto, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Following a bench trial, the defendant, Sotirios Georgakapoulos, was found guilty of the first degree murder of Jacobo Lozada. He was sentenced to 30 years' imprisonment. On appeal he contends that the trial court erred by failing to exclude the decedent's hearsay statements and by barring defense counsel from impeaching a witness with past criminal conduct. For the reasons discussed below, we affirm defendant's conviction.

## BACKGROUND FACTS

At approximately 11 p.m. on July 1, 1994, Jacobo Lozada (Jacob), a member of the Spanish Cobras (the Cobras) street gang, was shot while riding a bicycle on Lawndale Avenue in the vicinity of Jensen Park, in Chicago. Jensen Park is located on Lawndale Avenue and is bordered by Leland Avenue on the north and Wilson Avenue on the south. Jacob died on July 29 from the injuries he sustained as a result

of the July 1 gunshot wound. The defendant, Sotirios (Sammy) Georgakapoulos, a member of the rival Simon City Royals (the Royals) street gang,[1] was charged with the shooting.

The evidence at trial showed that shortly before the shooting, the Cobras had "taken" Jensen Park from the Royals. On June 29, 1994, the car of a girlfriend of a Royals gang member named Jamie had been broken into and the tires slashed. On the night of July 1, approximately 17 Cobras were at Jensen Park, and they were expecting trouble. Two Cobras served as "look-outs": Oscar Chavez, who stood at the intersection of Leland and Lawndale, across the street from the park, and Timothy Downs, who stood in the middle of Lawndale, across from the park. Ray Lozada, Jacob's brother, stood across from the park at Wilson and Lawndale. The area surrounding the park was illuminated by park lights and streetlights. At approximately 10:45 p.m., a dark blue, four-door Oldsmobile automobile, occupied by Royals, turned onto Lawndale from Leland and proceeded south toward Wilson. At trial, Ray Lozada, Chavez, and Joel Mendoza (Lozada's cousin who was playing basketball at the park) identified "Louie" as the driver of the automobile, the defendant as the front-seat passenger, and "Jamie" as the backseat passenger. Downs testified that he was able to see Louie and the defendant in the car.

Ray Lozada testified that, as the Oldsmobile drove past the park, it slowed down. The Oldsmobile's windows were open. Ray, who was about 10 feet away, heard its three occupants yell "Royal Love" and "Cobra Killer." The car then continued down Lawndale and turned onto Wilson. Lozada explained the term "Royal Love" demonstrated loyalty to the Royals and the term "Cobra Killer" was an insult to the Cobras. Ray testified that, at about 11 p.m., Jacob borrowed a bicycle from Mendoza and began riding it north in the center of Lawndale Avenue. While Jacob was riding the bicycle, Ray heard someone yell "watch out" and then heard a gunshot. Ray testified that, at the time of the shooting, Jacob was directly across from a gangway between two buildings across the street from the park. According to Ray, the gangway extended to the street. There was a three-foot-high fence between the gangway and the street. Ray testified that the area was well lit and he had no "trouble seeing out there."

Mendoza, a non-gang member, testified that he was playing basketball at the park when at approximately 11 p.m. he heard a warning to "watch out." He looked and saw three people standing in the gangway across the street from the park on the east side of Lawndale. Mendoza was about 50 feet from that gangway. He could see the

---

[1]The record also refers to defendant's gang as the "Asylum City Royals."

heights of the individuals but not their faces. They were all wearing "hoodies," hoods attached to sweatshirts. He stated the tallest of the three individuals was standing in the back while the next highest in height was in the front looking north toward Leland. He stated that the shortest of the three individuals, who was in the middle, fired the shot. Mendoza testified that he knew Louie, Jamie and the defendant and that Louie was six inches taller than the defendant and Jamie was taller than Louie. He stated that he did not see the shooter's face but thought the shooter was the defendant because of the shooter's height and because the defendant had driven by earlier.

Armando Cruz, a non-gang member who was playing basketball at the park on the night of July 1, 1994, testified that he saw Jacob ride a bicycle down Lawndale. Cruz, who was standing approximately 75 feet away from the gangway across from the park, saw a person wearing a "hoodie" come 10 feet out of the gangway and fire a shot. According to Cruz, Jacob was in the line of fire. Cruz testified that he could not see the shooter's face but saw that the shooter was about 5 feet 7 inches tall. After the shooting, Cruz saw the shooter and a second person run down the gangway to the alley.

Timothy Downs testified that he stood 35 to 40 feet from the gangway when he heard the gunshot. He testified that he saw the defendant pointing a chrome gun at Jacob. Downs thought the defendant held the gun in his left hand. He stated that the defendant stood approximately 10 feet in front of the gangway, 25 to 30 feet in front of him, when the shot was fired. Downs testified that immediately after the shooting the defendant looked at him and then turned and ran back down the gangway away from Lawndale. Downs stated that there was nothing obstructing his view of the defendant and he had no difficulty seeing him. Downs testified that on October 24, 1994, he viewed a lineup and identified the defendant as the shooter.

On cross-examination, Downs denied telling his cousin, Susan Shelton, defendant's girlfriend, that he did not see anything of relevance on July 1, 1994. He stated that he did not go to the police station after the shooting to give the police any information about the July 1, 1994, shooting. He further stated that he first discussed the July 1, 1994, shooting with the police in October 1994 after he had been "picked up" by the police concerning another matter. Downs also stated that the person shooting the gun in the gangway wore a black sweatshirt but "did not have the hoodie up."

Ray Lozada, Mendoza, Cruz, Downs and Chavez all testified that after hearing the gunshot they saw Jacob dismount the bicycle, walk to the parkway on Lawndale, and lie on the grass in pain. They ran over to him and saw blood covering the left side of his chest. Ray testi-

fied that he asked his brother what happened and that his brother responded that he had gotten shot. Ray stated that he then asked Jacob who shot him and Jacob responded, " 'Sammy.' " Ray then asked, "Who? What Sammy?" Jacob answered, " 'Royals Sammy.' " Chavez also asked Jacob, "What's wrong, what happened" and was told by Jacob, " 'They shot me, Sammy shot me. Sammy shot me.' " Downs, who testified that he reached Jacob first, stated that Jacob told him he had been shot in the shoulder and said " 'Sammy did it, Sammy did it.' " Cruz testified that he ran toward Jacob and upon reaching him heard Jacob screaming in pain and saying the name " 'Sammy.' " Mendoza testified that he heard Jacob say " 'Sammy shot me from the Royals.' " In addition, Chicago police officer Charles White, who arrived on the scene within 10 to 20 minutes of the shooting, heard Jacob name "Sammy" as the shooter.

At the conclusion of the State's case, the parties stipulated that Jacobo Lozada died from a single gunshot wound to his chest which lacerated an artery and vein causing respiratory, renal, and cardiovascular failure. The parties also stipulated that if called to testify, Chicago police detective Guevara would state that on October 21, 1994, he conducted a lineup and that Downs identified the defendant at that lineup as the person who shot Jacob.

In defense, Susan Shelton testified that she was the ex-girlfriend of the defendant and that Timothy Downs was her first cousin. She testified that she, Downs, another cousin named Greg Faye, and Downs' girlfriend, named Angie Childres, had a conversation about the defendant and the shooting at Jensen Park. She stated that the conversation occurred in the spring or August or "something around there." When asked by the court whether the conversation occurred in 1995 or 1996, Shelton first stated she was not sure and then stated that the conversation occurred in the spring of 1995. Shelton testified that during the conversation, Faye asked Downs "why he wanted to put someone in jail for something they didn't do." Shelton testified that Downs replied, " 'it didn't matter, he is just another Royal.' " Downs told them that if he didn't testify he would be "locked up for perjury." Shelton also stated that Downs had a reputation within her family in Chicago as being a liar. She further testified that Downs told her that he did not see the defendant in the car in the alley before the shooting.

On cross-examination, Shelton identified documents prepared by defendant's attorney which described a May 30, 1996, conversation between herself and the attorney. The document indicated that she told the attorney that Downs said he saw the defendant in the alley immediately before the shooting. When asked about her gang affiliation,

Shelton denied being a gang member; denied telling a police officer on September 16, 1996, that she was a Gangster Disciple; and denied admitting to having a prior membership in the "Deuces."

Jeannie Georgakapoulos, the defendant's mother, testified that the defendant was right-handed.

In rebuttal, the State called Elizabeth Matheson, a Chicago police officer. Matheson testified that on September 19, 1996, she responded to a call at the Chicago Day School regarding a girl with a knife. She stated that the victim of the assault identified the offender as Susan Shelton. Shelton, who was present, told Matheson that she was a "Deuce" from Hamlin Park.

Chicago police officer Andruzzi testified that he responded to a call on January 30, 1994, involving a battery at 2033 West School Street. On that occasion, Andruzzi took Shelton back to the police station, and during a conversation that occurred at 10:30 p.m., Shelton told him that she was a member of the Insane Deuces street gang.

Chicago police officer Joe Rodriguez, a gang investigator, testified that the Insane Deuces are allies of the Royals.

After viewing video tapes presented by both sides showing the scene of the shooting and after hearing argument of counsel, the trial court found the defendant guilty of first degree murder. The court based that finding primarily on the fact that Jacob named the defendant as the shooter. In addition, the court considered the fact that several witnesses saw the defendant and heard him yelling threats in the area of the shooting and shortly before the shooting. The court rejected Downs' testimony that he saw the defendant shoot Jacob.

Prior to sentencing, the defendant presented a motion for new trial. In support of his motion, and over objection by the State, the defendant was permitted to call a witness, Nancy Konz. Konz testified that another person, nicknamed "Rook," whom she had known for seven to eight years and with whom she had lived for two years, told her a month prior to the hearing that he and Louie Piatkowski shot Jacob Lozada. On cross-examination, Konz stated that "Rook" and the defendant were both members of the Royals gang. She stated that she was not aware that Louie had been involved in another shooting a couple of days prior to the shooting of Jacob. She stated even though "Rook" was upset that the defendant would be going to jail for Jacob's shooting, "Rook" did not go to court to testify for the defendant. Konz stated that neither she nor "Rook" went to the police to tell them about "Rook's" involvement in Jacob's shooting. She also stated that she was no longer living with "Rook" at the time of the hearing.

Finding Konz's testimony untrustworthy and unreliable, the trial court denied defendant's motion for a new trial and sentenced the defendant to a 30-year term of incarceration.

## DISCUSSION

### I. Admissibility of Jacob's Statements

On appeal, the defendant first argues that the trial court erred in failing to exclude Jacob's hearsay statements identifying "Sammy" as the shooter. The defendant contends that the statements should not have been admitted as dying declarations because the State failed to prove beyond a reasonable doubt that Jacob was in sufficient possession of his mental faculties at the time he made the statements. The defendant further contends that the statements should not have been admitted as excited utterances because the statements were made over a period of time and were not spontaneous and because Jacob was self-interested when he made them.

Prior to trial, the defendant filed a motion *in limine* to preclude the admission of Jacob's statements because there was no evidence from which it could be inferred that Jacob believed his death was impending and certain to follow. At the hearing on that motion, the State called Chicago fire department paramedic Steven Krason to testify. Krason testified that on July 1, 1994, he received an assignment to proceed to Jensen Park to render assistance to a man who had been shot. He observed a man bleeding "pretty severely" lying in the grass. Krason assessed the man's condition as being very critical. The man was taken into the ambulance where his blood pressure was measured to be "comparable to almost nothing," his pulse was extremely fast, and his respiration rate was fast. According to Krason, the man was in shock and his condition necessitated that he be transported to the nearest trauma center rather than the nearest hospital.

After hearing argument of counsel, the trial court denied defendant's motion *in limine*. The court ruled that Jacob's statements would be admitted as dying declarations. The court found that Jacob knew he was near death since he was in extremely critical condition, was bleeding heavily, and had weak vital signs. The court also ruled that Jacob's statements would be admissible as excited utterances because they were uttered immediately after Jacob was shot and because they related to a startling event.

■ A dying declaration is a statement of fact made by the victim relating to the cause and circumstances of the homicide. *People v. Harris*, 236 Ill. App. 3d 574, 578, 603 N.E.2d 65, 67-68 (1992). A dying declaration is admissible as an exception to the hearsay rule because it possesses a guarantee of trustworthiness "in the assumption that belief of impending death excludes the possibility of fabrication by the declarant." M. Graham, Cleary & Graham's Handbook of Illinois Evi-

dence § 804.6, at 778 (6th ed. 1994) (hereinafter cited as Graham, Illinois Evidence), citing *Starkey v. People*, 17 Ill. 17 (1855). The requirements for admitting a dying declaration into evidence are: (1) the declaration pertains to the cause or circumstance of the homicide; (2) the declarant must believe that death is imminent; and (3) the declarant must possess mental faculties sufficient to give an accurate statement about the circumstances of the homicide. *E.g., People v. Lawson*, 232 Ill. App. 3d 284, 292-93, 596 N.E.2d 1235, 1242 (1992); *People v. Barnes*, 117 Ill. App. 3d 965, 969-70, 453 N.E.2d 1371, 1376 (1983). The existence of these factors must be proven by the profferor beyond a reasonable doubt, based upon an examination of the totality of the facts and circumstances surrounding the declaration. *E.g., Lawson*, 232 Ill. App. 3d at 292-93, 596 N.E.2d at 1242; *People v. Cobb*, 186 Ill. App. 3d 898, 908, 542 N.E.2d 1171, 1178 (1989); *People v. Rhoads*, 110 Ill. App. 3d 1107, 1119, 443 N.E.2d 673, 683 (1982). Belief in the imminence of death may be shown by the declarant's own statements or from circumstantial evidence, such as the nature of the wounds or statements made in his presence. *Lawson*, 232 Ill. App. 3d at 292-93, 596 N.E.2d at 1242. See generally Graham, Illinois Evidence § 804.6, at 779. At the time the statement is made, the declarant must be able to perceive and give a true and correct account of the facts to which the statement relates. *Rhoads*, 110 Ill. App. 3d at 1119, 443 N.E.2d at 683. Courts of review are reluctant to disturb the trial court's ruling on the admissibility of a purported dying declaration (*Cobb*, 186 Ill. App. 3d at 908, 542 N.E.2d at 1178, citing *People v. Tilley*, 406 Ill. 398, 403-04, 94 N.E.2d 328, 331-32 (1950)), and they will not disturb that determination unless it is palpably contrary to the manifest weight of the evidence (*Lawson*, 232 Ill. App. 3d at 293, 596 N.E.2d at 1242; *People v. Webb*, 125 Ill. App. 3d 924, 934, 466 N.E.2d 936, 942 (1984)).

█ In the instant case, the defendant argues that the evidence did not establish that Jacob sufficiently possessed his mental faculties. He cites to the paramedic's testimony that Jacob was severely bleeding, had a fast pulse and respiration rate and almost no blood pressure, and was in shock. We disagree. First we note that while the paramedic testified to Jacob's physical condition and vital signs, he did not testify regarding Jacob's ability to perceive and communicate the circumstances surrounding his shooting. The paramedic was not asked questions concerning that issue nor did he volunteer any information on that subject.

Defendant's argument also fails to consider the testimony of the witnesses who were in Jacob's presence before the paramedic arrived and immediately after the shooting. Those witnesses, Ray Lozada, Mendoza, Cruz, Downs and Chavez, heard Jacob identify "Sammy" as

the shooter, and they observed Jacob at the time he identified "Sammy." They testified that immediately after the shooting they saw Jacob dismount the bicycle and walk to the grass parkway to the side of the street. They were but short distances from Jacob, and when they ran to him they reached his side instantaneously. Ray Lozada testified that when he reached Jacob, he asked Jacob what happened and who shot him. According to Ray, Jacob responded that he had been shot and that "Sammy" shot him. Ray then asked Jacob, "Who? What Sammy?" and Jacob answered, " 'Royals Sammy.' " Chavez also testified that he asked Jacob what happened and heard Jacob respond, " 'They shot me, Sammy shot me. Sammy shot me.' " These interchanges show that Jacob had the ability to listen to questions posed to him and to answer those questions coherently. See *Rhoads*, 110 Ill. App. 3d at 1120, 443 N.E.2d at 683-84 (finding victim had sufficient mental faculty to identify her attacker because she was able to answer questions about the incident); see also *Barnes*, 117 Ill. App. 3d at 970, 453 N.E.2d at 1376-77 (finding evidence of sufficient mental faculty based upon victim's ability to answer questions requiring more than a "yes" or "no" response); *People v. Davis*, 93 Ill. App. 3d 217, 232-33, 416 N.E.2d 1197, 1209 (1981) (same).

A closer question exists as to whether the evidence satisfied the dying declaration requirement that the declarant believe that death is imminent. We note that the defendant argued this issue in the trial court but elected not to raise it on appeal. We nevertheless address that issue here.

A statement sought to be admitted as a dying declaration must be supported by evidence showing that, at the time it was made, the declarant possessed " 'the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand.' " *Webb*, 125 Ill. App. 3d at 934, 466 N.E.2d at 942, quoting *Tilley*, 406 Ill. at 403-04, 94 N.E.2d at 331. Accord *Harris*, 236 Ill. App. 3d at 578, 603 N.E.2d at 68. Proof of such a belief can be established by any adequate method of communication, whether by words or signs; and it is proper to consider circumstantial evidence such as the nature of the wounds, statements made in the declarant's presence and the opinions of his physicians. *E.g., Lawson*, 232 Ill. App. 3d at 293, 596 N.E.2d at 1242; *Webb*, 125 Ill. App. 3d at 935, 466 N.E.2d at 943; *Rhoads*, 110 Ill. App. 3d at 1119, 443 N.E.2d at 683. See generally M. Graham, Illinois Evidence § 804.6, at 779. In this regard, there is language in the supreme court decision of *People v. House*, 141 Ill. 2d 323, 566 N.E.2d 259 (1990), to suggest that there

must be some overt evidence, other than the mere severity of the injury, to show that the declarant believed that death was imminent. In that case, the court affirmed the trial court's rejection of a statement as a dying declaration where there was no evidence that the declarant, who sustained severe burns over 40% of her body, "had been told she was going to die or that she believed she was going to die." *House*, 141 Ill. 2d at 381, 566 N.E.2d at 285. Accord *Harris*, 236 Ill. App. 3d at 579, 603 N.E.2d at 68 (affirming rejection of statement as dying declaration where medical personnel did not advise declarant, who had been shot in the stomach by a 12-gauge sawed-off shotgun, that she was in danger of dying and where declarant made no statement to the effect that she thought she was going to die); *People v. Timmons*, 127 Ill. App. 3d 679, 685, 469 N.E.2d 646, 650 (1984) (affirming rejection of statement as dying declaration where no evidence that declarant, who had been shot in the carotid artery, jugular vein and trachea, " 'believed himself *in extremis* when the statements were made' "); *People v. Thomas*, 49 Ill. App. 3d 961, 970, 364 N.E.2d 641, 647 (1977) (finding error in admission of statement as dying declaration where no direct evidence that declarant, who had been mortally injured by gunshot wounds to the stomach and hand, considered himself *in extremis.*) If construed conservatively, *House* would require a direct statement from the declarant or to the declarant, acknowledged by the declarant, that he or she was dying. However, many of the cases following *House*, at least in terms of *dictum*, have refused to limit proof of this element to an expressed declaration of impending death and would seem to permit such proof by circumstantial evidence concerning the severity of the declarant's injuries. See *People v. Walker*, 262 Ill. App. 3d 796, 801, 635 N.E.2d 684, 690 (1994) (belief of imminent death inferred from condition of victim); *Lawson*, 232 Ill. App. 3d at 293, 596 N.E.2d at 1242 (in addition to words and actions of victim, court considered grievous nature of declarant's wounds as justifying the conclusion that the victim knew of the seriousness of his condition); *Webb*, 125 Ill. App. 3d at 935, 466 N.E.2d at 943 (same); *Rhoads*, 110 Ill. App. 3d at 1120, 443 N.E.2d at 683-84 (same). Such a view is espoused by Professor Graham in his treatise on Illinois evidence. See M. Graham, Illinois Evidence § 804.6, at 779 ("[b]elief in imminence of his death may be shown by the declarant's own statements *or* from circumstantial evidence, such as the nature of his wounds"). (Emphasis added.) It would seem that circumstantial evidence stemming from the declarant's physical condition would suffice as a basis from which to infer declarant's belief of the imminency of death. Moreover, such a determination is a factual one and should not be upset unless palpably contrary to the manifest weight of the evi-

dence. *Lawson*, 232 Ill. App. 3d at 293, 596 N.E.2d at 1242; *Webb*, 125 Ill. App. 3d at 934, 466 N.E.2d at 942. However, we need not dispositively resolve this lingering issue *since*, in any event, Jacob's statements were properly admitted as spontaneous declarations.

■ Three factors have been deemed necessary to lay the foundation for the admission of a statement under the spontaneous declaration or excited utterance exception to the hearsay rule. They are: (1) an occurrence sufficiently startling to produce a spontaneous statement; (2) an absence of time to fabricate; and (3) a relation of the statement to the circumstances of the occurrence. *E.g., House*, 141 Ill. 2d at 381, 566 N.E.2d at 285; *People v. Thomas*, 49 Ill. App. 3d 961, 972, 364 N.E.2d 641, 648 (1977). As explained in *People v. Damen*, 28 Ill. 2d 464, 193 N.E.2d 25 (1963):

> "The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since the utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him." *Damen*, 28 Ill. 2d at 471, 193 N.E.2d at 29.

In recent years, several factors have been used by the courts to determine whether the declarant's statement was in fact spontaneous, excited and unreflecting. They include the period of time between the event and the utterance, the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest. *House*, 141 Ill. 2d at 381, 566 N.E.2d at 285. No one factor is determinative since each case must rest on its own facts; and the statement is judged based upon an examination of the totality of the circumstances surrounding the event. *People v. Lesure*, 271 Ill. App. 3d 679, 683, 648 N.E.2d 1123, 1126 (1995); *Walker*, 262 Ill. App. 3d at 801-02, 635 N.E.2d at 690. See generally M. Graham, Illinois Evidence § 803.3, at 702 (a self-serving statement may be admissible as an excited utterance based upon the totality of the circumstances). The determination of whether a statement qualifies as an excited utterance or spontaneous declaration is within the trial court's "considerable" discretion. *Walker*, 262 Ill. App. 3d at 801-02, 635 N.E.2d at 690; *People v. Allen*, 249 Ill. App. 3d 1001, 1019, 620 N.E.2d 1105, 1118 (1993).

In the instant case, the defendant concedes that Jacob's statements to Ray, Chavez and Downs, and those overheard by Mendoza and Cruz, occurred almost immediately after the shooting and related to a startling event, a shooting. He argues, however, that Jacob's statements to those individuals and to Officer White lacked reliability and did not qualify as excited utterances because Jacob was motivated by self-interest and by his gang membership to identify a rival gang member and because Jacob was repeatedly questioned at the time he made the statements. The defendant also argues that Jacob's statement to Officer White was too remote in time. We disagree.

We note that the defendant places great emphasis on the fact that the shooting in the instant case resulted from a dispute between rival gangs. The defendant suggests that Jacob's identification of him was influenced by the "intervening occurrence" (see *People v. Sommerville*, 193 Ill. App. 3d 161, 174, 549 N.E.2d 1315, 1325 (1990)) of gang membership and Jacob's obligation to act in the interest of his gang by blaming a rival gang member. The defendant further suggests that Jacob may have been "coached" by Downs or other Spanish Cobras to identify him. We find these contentions unsupported by the law or by the facts. The key criteria for finding the existence of an excited utterance is that it be spontaneous, unreflecting and made in a time frame and under conditions which would foreclose any opportunity to fabricate. *House*, 141 Ill. 2d at 384, 566 N.E.2d at 286. The facts presented in the instant case support the finding by the trial court that Jacob's statements identifying "Sammy" as the shooter were made under conditions which would foreclose an opportunity to fabricate. Those facts show that Jacob's statements were made almost immediately after he was shot. He was seriously wounded and lay bleeding on the ground. One who has suffered such injuries could hardly be concerned with gang loyalty and revenge. See *People v. Wofford*, 156 Ill. App. 3d 238, 245, 509 N.E.2d 1026, 1031 (1987) (finding lack of time to fabricate where shooting victim ran down street, collapsed, hysterical, in great pain, and bleeding profusely); *People v. Sanchez*, 105 Ill. App. 3d 488, 492, 434 N.E.2d 395, 397 (1982) (finding lack of time to fabricate where victim in great pain, shivering, and groaning). Defendant's suggestion that Jacob may have been "coached" by Downs or other gang members to identify him as the shooter is pure speculation. There is nothing in the record to support the suggestion that Downs or anyone else discussed with Jacob, as he lay bleeding in the grass, the possibility that he identify a Royal gang member as the shooter in furtherance of the Cobra's rivalry with the Royals. Instead, the record shows that Jacob named "Sammy" as the shooter when several of the witnesses ran to him immediately after the shooting. Ray and Chavez

testified that when they reached Jacob they asked him what happened and/or who shot him. Downs testified that when he reached Jacob, Jacob "started saying 'Sammy did it, Sammy did it' " and that Downs merely responded, "I know, I know."

●5 We also reject defendant's contention that Jacob's statements were not excited utterances because they were made in response to questions posed by Ray and Chavez. The fact that a statement is made in response to a question does not automatically negate the statement's spontaneity, but instead is merely a factor to be considered in determining its reliability. *Damen*, 28 Ill. 2d at 472, 193 N.E.2d at 30. The response to the single question "what happened" or "who shot you" has been held not to destroy spontaneity. See, *e.g., People v. Smith*, 152 Ill. 2d 229, 260, 604 N.E.2d 858, 871 (1992); *Damen*, 28 Ill. 2d at 472, 193 N.E.2d at 30; *Wofford*, 156 Ill. App. 3d at 245, 509 N.E.2d at 1031. Similarly, spontaneity was found not to have been destroyed when the declarant's statements were made in response to two questions. See, *e.g., Walker*, 262 Ill. App. 3d at 801, 635 N.E.2d at 690 (spontaneity not destroyed when victim responded to the question "what happened" and identified the defendant as the shooter in response to another question); *People v. Jarvis*, 158 Ill. App. 3d 415, 423-24, 511 N.E.2d 813, 818 (1987) (victim's responses to police officer's questions "what happened" and "who shot you" found to be spontaneous declarations); *Sanchez*, 105 Ill. App. 3d at 489-90, 434 N.E.2d at 396-97 (spontaneity not destroyed when victim responded to questions of who shot her and who was the person she named). *Cf. People v. Hatfield*, 161 Ill. App. 3d 401, 409-10, 514 N.E.2d 572, 577 (1987) (child's responses to questions of why and what she meant were admitted as spontaneous declaration); *People v. Watts*, 139 Ill. App. 3d 837, 850, 487 N.E.2d 1077, 1086 (1985) (finding child's responses to mother's successive questions constituted spontaneous declaration). Spontaneity and reliability may be destroyed, however, when there is a detailed repetition of answers to several successive questions. *Sommerville*, 193 Ill. App. 3d at 174, 549 N.E.2d at 1325 (finding spontaneity and immediacy required for spontaneous declaration removed when rape victim responded to several questions posed to her on the telephone by her fiancé, including: "What's wrong?" "By who?" "Are you okay?" and "is he there with you now?"). In determining admissibility, the trial court should consider such factors as whether the statements would have been made if the questions had not been asked and whether the totality of the circumstances indicate that the declarant was still under the shock of the event when the statements were made. *Jarvis*, 158 Ill. App. 3d at 423-24, 511 N.E.2d at 818.

■ Here, under the totality of the facts presented, we cannot say

that the trial court abused its discretion in finding that Jacob's statements to Ray and Chavez were spontaneous even though made in response to questions directed at him. Jacob's statement to Chavez occurred in response to the single question "what happened," a question that has been held not to have destroyed spontaneity or reliability. See, *e.g., Smith*, 152 Ill. 2d at 260, 604 N.E.2d at 871; *Damen*, 28 Ill. 2d at 472, 193 N.E.2d at 30; *Walker*, 262 Ill. App. 3d at 801, 635 N.E.2d at 690; *Wofford*, 156 Ill. App. 3d at 245, 509 N.E.2d at 1031. Similarly, we cannot say that Jacob's responses to Ray's questions, "what happened," "who shot you," and "Who? What Sammy?" lacked spontaneity. It is clear from the record that even if he had not been asked those questions Jacob would have volunteered that information since he had done so to Downs, who was the first to reach him after he was shot.[2] So, too, it is clear that, when he responded to all of the questions put to him by Ray and Chavez, Jacob was still under the shock of the event. He had been shot moments before and lay seriously wounded on the ground. That condition alone would have inhibited Jacob's ability to reflect and fabricate an untrue version of the events. See *Jarvis*, 158 Ill. App. 3d at 424, 511 N.E.2d at 818. See also *Walker*, 262 Ill. App. 3d at 801, 635 N.E.2d at 690; *Watts*, 139 Ill. App. 3d at 850, 487 N.E.2d at 1086; *Sanchez*, 105 Ill. App. 3d at 491-92, 434 N.E.2d at 398.

Also, although not raised by the defendant, we note that Jacob's successive and repetitive statements concerning the identity of "Sammy" as the shooter could each qualify as spontaneous declarations or excited utterances. A person can make multiple spontaneous declarations so long as each declaration satisfies the requirement of reliability. "The fact that the declarant may have previously spoken to another is merely a factor to consider in determining admissibility." *House*, 141 Ill. 2d at 386, 566 N.E.2d at 287. See *Jarvis*, 158 Ill. App. 3d 415, 511 N.E.2d 813 (wherein court admitted as spontaneous declarations three statements made by the victim, one to his girlfriend immediately after the shooting, one to first police officer to arrive on the scene, and one to a second police officer who arrived about 15 minutes after the shooting).

■ Finally, we reject defendant's contention that Jacob's statement to Officer White was not admissible as an excited utterance because it did not occur immediately after the shooting. White testified that Jacob's statement to him occurred when he arrived at the

---

[2]As discussed in the fact and as will be further discussed below, the trial court specifically rejected Downs' testimony that he saw the defendant shoot Jacob. Arguably, the court did not reject Downs' testimony regarding Jacob's identification of the defendant.

scene approximately 10 to 20 minutes after the shooting. "Although the time lapsed between the occurrence and the utterance is material, the court must determine from the entirety of the circumstances whether time existed for reflection and invention." *Wofford*, 156 Ill. App. 3d at 244, 509 N.E.2d at 1030. See *House*, 141 Ill. 2d at 385-86, 566 N.E.2d at 286-87 (statement admissible as spontaneous declaration despite being made 2½ hours after occurrence). " 'The proper question is whether the statement was made while the excitement of the event predominated.' " *Smith*, 152 Ill. 2d at 260, 604 N.E.2d at 871, quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.3, at 627 (5th ed. 1990).

A factual situation substantially similar to the one in the instant case occurred in *Jarvis*, 158 Ill. App. 3d 415, 511 N.E.2d 813. There, the victim had been shot in his apartment. Almost immediately after the shooting he told his live-in girlfriend that the defendant shot him. He made a similar statement to the first police officer to arrive on the scene. Approximately 15 minutes after the shooting, he told a second police officer, who had just arrived, that the defendant shot him after being asked, "What happened?" The court admitted each of the statements as spontaneous declarations, including the last. With respect to the latter, the court found that it was not too far removed from the startling occurrence as to bring into question its reliability. *Jarvis*, 158 Ill. App. 3d at 424-25, 511 N.E.2d at 818-19. In reaching that conclusion, the court considered the short time span between the event and the statement and the victim's grave condition. Accord *Wofford*, 156 Ill. App. 3d at 245, 509 N.E.2d at 1030-31 (finding victim's statement to police officer who arrived at the scene several minutes after shooting admissible as a spontaneous declaration based upon fact that at the time he made the statement, the victim had collapsed on the ground, was in great pain, and was bleeding profusely). Here, as in *Jarvis* and *Wofford*, the victim had been shot, was seriously wounded and was bleeding profusely. The time between the shooting and the police officer's arrival was short, approximately 10 to 20 minutes. The victim's statement was made in response to the single question "who shot you." Given these facts, it was not an abuse of discretion for the court to admit Jacob's statement to Officer White as a spontaneous declaration. See also *Smith*, 152 Ill. 2d at 259-60, 604 N.E.2d at 871 (finding lack of sufficient time to fabricate where murder witness made statement of police officer within ten minutes of murder).

## II. Impeachment With Past Criminal Conduct

The defendant also argues that the trial court erred in barring defense counsel from impeaching Downs with his past criminal

conduct, namely, juvenile adjudications for unlawful use of a weapon, armed violence, attempted murder and aggravated battery.

Prior to trial, the State made a motion *in limine* to prevent the defendant from impeaching Downs with his prior juvenile adjudications. In response to argument by the parties, the trial court initially ruled as follows:

> "I don't think that an aggravated battery or attempt murder or a gun case does go to the credibility or moral turpitude, or does relate to whether the witness is telling the truth or not. They are not crimes such as obstruction of justice, perjury, theft, either felony or misdemeanor, even an unlawful taking of something.
>
> I don't think it goes to affect the credibility. I don't think it affects the believability or credibility of the witness."

Defense counsel argued that the adjudications would be relevant to show motive to testify falsely against the defendant. He surmised that if Downs committed the acts that served as the bases for the prior adjudications upon order of his gang chiefs, then the possibility existed that Downs was being ordered by his gang chiefs to give false testimony in the instant case to convict a rival gang member. The court responded:

> "But it has to affect credibility, has to be the kind of crime that affects credibility. And if it is like a shooting resulting in a second degree murder, by law it does not affect credibility, even though it's a serious felony conviction.
>
> My ruling is that the nature of these offenses balanced and considering all the factors in this case, do not affect moral turpitude, do not affect credibility. \*\*\*
>
> \*\*\* [T]he defense may cross examine the witness in terms of any bias he may have against this defendant, if he is a member of a rival gang, you can bring that out, if he is [*sic*] as you said, exhibited behavior that shows that he will testify falsely to get a rival gang member."

Noting that the instant proceeding was a bench trial, the court further explained that it would allow defense counsel to question Downs about the shooting adjudication and whether it involved defendant's rival gang. In that regard the court stated:

> "All right. This is a bench trial, I will let you ask the question who he was found delinquent of shooting or shooting at and whether that person was a member of some rival gang.
>
> \*\*\* If his answer is I shot whatever two months before, I hate the defendant's gang, it's a rival gang to my own, I hate them, and I shot against—I shot another of the defendant's fellow gang members, if he says yes, that happened, and he might, for all I know, then you brought up your point."

Upon further discussion the court ruled that if Downs denied the adjudication involved defendant's gang, and if the defendant could not prove the contrary, then that portion of the cross-examination would be stricken.

The records shows that after that ruling, during cross-examination of Downs, defense counsel asked Downs about the unlawful use of weapon adjudication. The State objected, and the court stated:

> "I don't care about the unlawful use of a weapon. I said you could bring out the armed violence, attempt murder, aggravated battery to see if it might relate to bias, interest in this case, and not even for credibility because I don't think the nature of those offenses relates to credibility.
>
> The gun case is out."

Counsel then questioned Downs about the adjudication for "shooting into a car." Downs admitted being arrested in November 1991 for shooting into the car of a rival gang member. He stated that, at the time of the shooting, he was a Latin King. He stated that the Latin Kings were not part of the Spanish Cobras. The remainder of Downs' cross-examination involved the July 1, 1994, shooting that was the subject of the instant trial. No evidence was presented to show that the 1991 shooting involved defendant's gang.

■ Evidence of juvenile adjudications of a witness, including the defendant, is clearly admissible for the purpose of showing motive or bias. *People v. Sharrod*, 271 Ill. App. 3d 684, 689, 648 N.E.2d 1141, 1144 (1995). As noted, the court did permit inquiry for that purpose, subject to laying a foundation. The defendant, however, was unable to lay such a foundation and raises no error on the part of the trial court with respect that issue. What the defendant does contend is that the court erred in precluding use of Downs' adjudications for the purpose of impeaching his general character for truth and trustworthiness. The rule is clear that such evidence generally may be admissible to attack the credibility of a witness other than the defendant if, at the discretion of the trial court: (1) the conviction would be admissible for an adult, and (2) its admission in evidence is necessary to a fair determination of guilt or innocence. *People v. Berberena*, 265 Ill. App. 3d 1033, 1049-50, 639 N.E.2d 599, 610 (1994); see *People v. Montgomery*, 47 Ill. 2d 510, 517, 268 N.E.2d 695, 699 (1971); *People v. Kerns*, 229 Ill. App. 3d 938, 595 N.E.2d 207 (1992). As provided in *Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695, a witness can be impeached with a prior criminal conviction, not more than 10 years old, if the conviction is punishable by death or imprisonment in excess of one year or if it involves dishonesty or false statement regardless of punishment. Admissibility of a conviction that meets either of these tests is

discretionary with the trial court such that, if the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice, evidence of the conviction will not be admitted. *People v. Williams*, 173 Ill. 2d 48, 81, 670 N.E.2d 638, 654 (1996); *People v. Williams*, 161 Ill. 2d 1, 38, 641 N.E.2d 296, 311 (1994). There is no error if the trial court does not expressly articulate this balancing test as long as the trial transcript makes clear that the trial judge was applying the *Montgomery* balancing test. *Williams*, 173 Ill. 2d at 83, 670 N.E.2d at 655; *People v. Jackson*, 299 Ill. App. 3d 104, 113, 700 N.E.2d 736, 742 (1998). If the record shows that the trial court did not conduct a meaningful *Montgomery* test, error is committed. *People v. McGee*, 286 Ill. App. 3d 786, 793, 676 N.E.2d 1341, 1346 (1997).

The State initially argues that the defendant waived this issue by not raising it in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 184-85, 522 N.E.2d 1124, 1129-30 (1988). The defendant responds, however, that this issue should be reviewed as plain error pursuant to Supreme Court Rule 615(b) (134 Ill. 2d R. 615(b)), contending that the evidence was closely balanced. Under the plain error exception to the waiver rule, reviewing courts will examine issues not properly preserved where the evidence is closely balanced or the alleged error is so fundamental that it denied the defendant a fair trial. *E.g., People v. Cloutier*, 178 Ill. 2d 141, 687 N.E.2d 930 (1997); *People v. Thomas*, 178 Ill. 2d 215, 687 N.E.2d 892 (1997). Here, the evidence is not closely balanced. The defendant was identified as the shooter by the victim immediately after the shooting. That identification was made in the presence of Ray Lozada, Mendoza, Chavez, Cruz, Downs and Officer White, all of whom testified at trial. The trial court gave great weight to the victim's identification. In addition, Ray Lozada, Mendoza, Chavez and Downs placed the defendant in the area shortly before the shooting. Mendoza and Cruz testified that they saw the shooter immediately after the shot was fired. Although they could not see the shooter's face, they stated that the shooter was the same size as the defendant. Downs, who was standing in a different location from Mendoza and Cruz, testified that he saw the defendant pointing a gun at Jacob.

■ Defendant nevertheless contends that the evidence was close because of his attack on the credibility of the State's witnesses. The record shows that the attack on most of the State's witnesses primarily concerned the condition of the lighting and their ability to see. The witnesses remained steadfast in their testimony and stated that they had no difficulty seeing because the streetlights and park lights were illuminated. With respect to witness Downs, the defendant argues that

his testimony was incredible because it conflicted with the testimony of Mendoza and Cruz as to whether the shooter was wearing a "hoodie"; because Downs testified that he thought the defendant was holding the gun in his left hand whereas defendant's mother testified that the defendant was right-handed; and because Shelton testified that Downs had a reputation as being a liar and that Downs admitted to her that his identification of the defendant was a lie. Even if we were to agree that Downs' testimony was sufficiently discredited (it appears from the record that the trial court rejected Downs' testimony, at least with respect to his identification of the defendant as the shooter), that fact would not eliminate the other strong evidence discussed above, namely, the identification of the defendant by the victim to the other witnesses. See, *e.g.*, *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319 (1989) (the testimony of single eyewitness, if positive and credible, is sufficient for conviction for murder); *People v. Goodloe*, 263 Ill. App. 3d 1060, 1069, 636 N.E.2d 1041, 1047 (1994) (same). Thus, we do not find the evidence to be closely balanced so as to preserve defendant's contention concerning the use of Downs' juvenile adjudications under the plain error exception.

　　However, even if we were to reach the issue raised, we would find the existence of harmless error beyond a reasonable doubt. A review of the record and the passages therefrom set forth above shows that the trial court improperly ignored the first and third prongs of the *Montgomery* test and considered only the second prong, whether the crimes involved dishonesty or false statement. Under the first prong of that test, evidence of past criminal conduct is admissible, even if the crime does not directly involve dishonesty or false statement, because it " 'rest[s] on the common-sense proposition that a person who has flouted society's most fundamental norms, as embodied in its felony statutes, is less likely than other members of society to be deterred from lying under oath in a trial.' " *People v. Robinson*, 299 Ill. App. 3d 426, 441, 701 N.E.2d 231, 243 (1998), quoting *Campbell v. Greer*, 831 F.2d 700, 707 (7th Cir. 1987). Evidence of such a crime is admissible unless, after application of the balancing test, the judge concludes that its probative value is outweighed by its prejudicial impact. *E.g.*, *Williams*, 173 Ill. 2d at 81, 670 N.E.2d at 654.

　　Here, as discussed, the trial court limited its analysis to whether the prior juvenile adjudications involved crimes of dishonesty or false statement. The court did not consider whether those adjudications could be admissible even though they did not directly involve dishonesty or false statement so long as their probative value outweighed their prejudicial impact. While at one point the court stated that it "balanced and consider[ed] all the factors in this case," that balancing

appears to have been limited to considering only whether the offenses "affect[ed] credibility." Since there may be some probative value in the commission of any felony (see *Robinson*, 299 Ill. App. 3d at 441, 701 N.E.2d at 243), that probative value must be weighed against its prejudicial impact. The failure to conduct a meaningful balancing test resulted in error. See *Williams*, 173 Ill. 2d at 81, 670 N.E.2d at 654-55; *Williams*, 161 Ill. 2d at 38, 641 N.E.2d at 311; *Jackson*, 299 Ill. App. 3d at 113, 700 N.E.2d at 743; *McGee*, 286 Ill. App. 3d at 793, 676 N.E.2d at 1346. That error was harmless, however, because the admission of evidence of the prior adjudications would have served only to impeach Downs' credibility. As discussed above, even without that evidence, the court discredited at least a substantial portion of key testimony given by Downs that immediately after hearing the shot he looked at the defendant and the defendant looked at him. While it is not so clear that the court discredited Downs' testimony regarding Jacob's spontaneous utterance, even if it had done so, several other witnesses testified to excited utterances by Jacob naming the defendant as his assailant. As a result, the admission of Downs' prior juvenile adjudications for impeachment purposes would have had no effect on the outcome of the case.

■ Given our conclusion that the admission of the prior adjudications would not have affected the outcome of the case, we reject defendant's alternate argument that his counsel's failure to raise this issue in the posttrial motion amounted to ineffective assistance of counsel. In order to establish ineffective assistance of counsel, a defendant must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). Since, for the reasons discussed above, the defendant could not establish that the result of the proceeding would have been different, his ineffective assistance of counsel argument must fail.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY and COUSINS, JJ., concur.