THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN GAGLIANI, Defendant-Appellant.

Second District   No. 2—91—1441

Opinion filed November 10, 1993.

Josette Skelnik, of Law Offices of Josette Skelnik, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Following a jury trial in Du Page County, the defendant, Steven Gagliani, was found guilty of home invasion (Ill. Rev. Stat. 1987, ch. 38, par. 12—11(a)(1) (now codified, as amended, at 720 ILCS 5/12—11(a)(1) (West 1992))), residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 19—3(a) (now 720 ILCS 5/19—3(a) (West 1992))), armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a) (now 720 ILCS 5/18—2(a) (West 1992))), and two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1) (now codified, as amended, at 720 ILCS 5/12—14(a)(1) (West 1992))). The trial court sentenced the defendant to 30 years' imprisonment for the home invasion conviction, 30 years' for the aggravated sexual assault convictions, and 8 years' for the residential burglary conviction, each term to run concurrently. The court also sentenced the defendant to 12 years' imprisonment for armed robbery to run consecutively to the other sentences. The defendant filed a timely notice of appeal.

The defendant contends on appeal that: (1) the trial court erred by refusing to give jury instructions on the lesser included offenses of robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—1(a) (now 720 ILCS 5/18—1(a) (West 1992))) and criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13 (now codified, as amended, at 720 ILCS 5/12—13 (West 1992))); (2) his conviction of armed robbery must be vacated because it is carved from the same act underlying the home invasion

conviction; and (3) the court abused its discretion in imposing a cumulative sentence of 42 years' imprisonment. We affirm.

The victim, Gwen, testified at trial that she arrived home from work on August 2, 1988, shortly after 10 p.m. She parked her car in the driveway, locked the doors, and then went inside the house. Shortly after entering her house, Gwen walked into the bedroom, turned on the television at the head of the bed, and lay down. When she first went to bed, Gwen was wearing a T-shirt, bra, and underwear. She later took off the shirt and bra and fell asleep while watching television. No other lights were on in the room. Gwen woke up when she heard a noise, and she then saw the defendant standing in the bedroom. He was holding a "long thin club" in his right hand.

Gwen asked the defendant what he was doing in her house, and he told her to "shut up" or he would kill her. Gwen asked him to leave, and he repeatedly told her to "shut up." The defendant then walked to the doorway of a bathroom which was connected to her bedroom. Gwen again asked him to leave, and he again told her to "shut up" or he would kill her. The defendant walked over to the television set and spent a few minutes attempting to turn it off. Gwen was able to see the defendant's reflection in the mirrors located near the television set.

After he successfully turned off the television, the defendant hollered at Gwen to come to the edge of the bed and put his penis in her mouth. The defendant held the club at the back of Gwen's head and told her that if she bit him he would kill her. After Gwen complied, the defendant hollered at her to move over. He then lay down in the bed and told her to again put his penis in her mouth. The defendant continued to hold the club at the back of her head. Gwen complied for a second time. The defendant then told her to take off her underwear, and he proceeded to have vaginal intercourse with her.

The defendant got up and told Gwen that he wanted the keys to her car, and he followed her downstairs to retrieve them. After Gwen gave the defendant the car keys, he went to the front door and told her that if she called the police he would come back and kill her. The defendant left, and Gwen closed and locked the door.

After Gwen heard the defendant start her car, she put on some clothes, ran over to a neighbor's house, and asked the neighbor to call the police. A police officer arrived at the neighbor's house and talked with Gwen. The officer went with Gwen back to her house, at which time Gwen noticed that a pair of jeans and some jewelry had been moved from the bedroom to the basement. She also discovered that some money, a watch, and a ring were missing. An ambulance then

took her to the Glendale Heights Community Hospital, where she submitted to an examination.

The following afternoon, Gwen went to the police station and spoke with Detective Harrison. He showed Gwen a series of photographs, and she identified the defendant from the photographs as the person who had assaulted her. Detective Harrison told Gwen that they had found her car, and he took her to the garage. Gwen testified that the exterior of the car looked the same, but the car radio was "broken off." A club which she usually kept under the front seat was on top of the seat, and a hand-held radio had been moved from the backseat to the front seat.

On cross-examination, Gwen stated that she could not recall telling Officer Kirstein, the officer who spoke with her at the neighbor's house, that she had been unable to see the intruder's face. Gwen stated that she did remember telling Officer Kirstein that she did not know the person who had assaulted her. Gwen also testified that on the night in question the drapes in her bedroom were closed, the shades were drawn, and the only light in her bedroom came from the 13-inch television set which was angled toward the headboard of the bed.

Defense counsel asked Gwen whether the club she had kept locked in her car was the same club she had seen in the intruder's hand. Gwen first replied that she was not sure whether it was the same club, but later stated that she believed it was the same club. Gwen also testified that the intruder had not been wearing gloves while holding onto the club.

Jerome Zacny, Gwen's neighbor, testified that shortly after 1 a.m. on August 3, 1988, he was awakened by a pounding on the door. Zacny opened the door, and Gwen "jumped" into the house and grabbed him by both arms. Gwen was crying, and she asked Zacny to call the police. Zacny called the police, who arrived shortly thereafter.

Paul Frey, a police sergeant with the Village of Glendale Heights, testified that he discovered Gwen's car near her home at about 5:40 a.m. on August 3. There was nobody in the vehicle at that time. Frey called for a police tow truck and an evidence technician and then followed the tow truck and vehicle back to the police garage. Frey never went into the interior of the car.

Officer Ronald Kirstein testified that on August 3, 1988, at approximately 1:40 a.m., he was dispatched to the Zacnys' residence. Kirstein spoke with Gwen, who appeared "emotionally upset." Kirstein then accompanied Gwen back to her house, where he noticed a pair of jeans, a purse, and some jewelry in the basement. The base-

ment window was open and the screen was up. On cross-examination, Kirstein stated that Gwen told him that she had been unable to see the intruder's face.

Officer Gary Harrison testified that on August 3, 1988, at about 2 a.m., he was dispatched to Gwen's residence. He took photographs of the scene and recovered fingerprints from the screen window in the basement and the television set in the bedroom. Harrison then drove to the Glendale Heights Hospital, where he spoke with Gwen and obtained a description of the intruder. Harrison went back to the police station, where he photographed Gwen's car and dusted it for fingerprints.

On August 4, at approximately 1 p.m., Harrison met with Gwen at the Glendale Heights police department and showed her a photographic lineup which included a picture of the defendant. Gwen picked out the defendant's photograph within seconds of viewing the lineup. Harrison and his partner arrested the defendant at 9:15 p.m. on August 4 and brought him back to the police station.

At 10:30 p.m., Harrison met with the defendant and told him that "if you are not going to be honest with me, at least be honest with yourself and get yourself some help if you need it." The defendant began crying and told Harrison that he had "done it." The defendant also told Harrison that he had only intended to commit a burglary, but he did not know "what came over him" when he saw the woman lying in her underwear. Harrison asked the defendant where he had gotten the club, and the defendant replied that he had gotten it out of her car.

On cross-examination, Harrison stated that although the police department owned both a videotape camera and a tape recorder, he did not use any such equipment to record his conversation with the defendant. On re-cross-examination, Harrison stated that he wrote down notes while the defendant was making his statement, but that those notes were destroyed once a police report was written.

Paul Sahs, a detective with the Du Page County sheriff's office who specializes in fingerprint, tire mark and footwear identification, testified that the fingerprint found on the control panel of Gwen's television set matched the defendant's left thumb print. Fingerprints found on the inside top edge of the passenger window of Gwen's car matched the defendant's left ring and middle fingerprints. A fingerprint found on the broken stereo component in Gwen's car matched the defendant's right thumb print. Sahs was not able to obtain any prints from the club which Gwen kept in her car.

Kristin Sahs, a forensic chemist at the Du Page County crime lab, testified that a microscopic examination of vaginal and rectal smears

taken from Gwen during a physical examination on August 3, 1988, revealed the presence of sperm.

The defendant did not testify or offer any evidence in his behalf. After closing arguments, the jury returned guilty verdicts as to each offense charged. The defendant's motion for a new trial was denied, and the court sentenced the defendant to the previously mentioned terms of imprisonment. This appeal followed.

A common element of two of the offenses of which the defendant was convicted, aggravated criminal sexual assault and armed robbery, is that the defendant has a dangerous weapon when he commits the crime. The defendant contends, however, that there was evidence in the record from which the jury could conclude that he did not have a dangerous weapon when he allegedly robbed and sexually assaulted Gwen. He argues that the trial court therefore erred by refusing to give his tendered jury instructions on the lesser included offenses of robbery and criminal sexual assault, which do not require the presence of a dangerous weapon.

It is well settled that an instruction on a lesser included offense is required only if the trier of fact could rationally find the defendant guilty of the lesser offense and not guilty of the greater offense. (*People v. Perez* (1985), 108 Ill. 2d 70, 81; *People v. Austin* (1991), 216 Ill. App. 3d 913, 916-17.) An instruction on the lesser offense is properly refused where the evidence shows that the defendant is either guilty of the greater offense or not guilty of any offense. *Austin*, 216 Ill. App. 3d at 917.

The defendant argues that he could have been found guilty of the lesser offenses because there were no fingerprints found on the club which he allegedly used. Further, Gwen testified that she locked the club in her car on the night of the offense. The club was later found in her car, and there were no signs of damage to the exterior of the vehicle to establish a forced entry into the car in order for the defendant to obtain the weapon. The defendant also points out that Gwen confronted her assailant in a darkened room. The defendant contends that from this evidence the jury could have reasonably found that Gwen was mistaken or had not testified truthfully regarding the presence of a weapon.

■ We disagree. Gwen consistently testified that the defendant was holding a weapon, a long thin club, the entire time he was in her house. She also testified that the defendant held the club at the back of her head and threatened to kill her while he forced her to engage in oral sex. Detective Harrison testified that the defendant confessed to the crime and admitted that he had used the club from Gwen's automobile. Furthermore, although Paul Sahs testified that he was unable to develop

fingerprints from the club, he also stated that the club has a painted, grainy wood surface which is less amenable to fingerprints than a smoother, "hard type of surface." We hold that from this evidence the jury could not have rationally convicted the defendant of robbery and criminal sexual assault and acquitted him of armed robbery and aggravated criminal sexual assault.

This holding is consistent with *People v. Austin*. There, the defendant was charged with two counts of residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a) (now 720 ILCS 5/19—3(a) (West 1992))) for knowingly and without authority entering the victim's home with the intent to commit therein a theft. (*Austin*, 216 Ill. App. 3d at 914.) At the instructions conference, the defendant asked the trial court to give two jury instructions on the lesser included offense of criminal trespass to residence. (*Austin*, 216 Ill. App. 3d at 915.) Criminal trespass to residence is committed when a person knowingly enters or remains within a residence without authority. (Ill. Rev. Stat. 1985, ch. 38, par. 19—4(a) (now 720 ILCS 5/19—4(a) (West 1992)).) The trial court refused to give the tendered instructions, and the defendant was subsequently found guilty of the charged offenses.

We affirmed the trial court because the jury could not have rationally convicted the defendant of criminal trespass to residence and acquitted him of residential burglary. (*Austin*, 216 Ill. App. 3d at 917.) The victim had testified that when she awoke at 2:30 a.m. on July 22, 1986, an intruder wearing rubber gloves was standing next to her. (*Austin*, 216 Ill. App. 3d at 915.) His right hand was near her mouth and his left hand was reaching to turn off a nearby lamp. (*Austin*, 216 Ill. App. 3d at 915.) The victim pulled the glove off the intruder's right hand and screamed. (*Austin*, 216 Ill. App. 3d at 915.) The intruder then ran out the patio door. He never touched the victim nor did he take anything from her home. (*Austin*, 216 Ill. App. 3d at 915.) The victim identified the defendant as the intruder. *Austin*, 216 Ill. App. 3d at 915.

The defendant did not testify or offer any evidence in his behalf. (*Austin*, 216 Ill. App. 3d at 915.) In his opening statement and closing argument defense counsel argued that the defendant was misidentified. (*Austin*, 216 Ill. App. 3d at 915.) We held that since the only defense arising from the evidence and defense counsel's arguments was misidentification, the defendant was either guilty of the offenses as charged or not guilty. *Austin*, 216 Ill. App. 3d at 917.

Similarly, in this case, the defendant offered no evidence refuting Gwen's testimony that she had been assaulted and robbed by a man holding a long, thin club. However, Gwen testified that the bedroom was dark on the night of the attack and that the only light in her bedroom

came from the 13-inch television set. Officer Kirstein testified that Gwen told him that she had been unable to see her attacker's face. The only defense arising from this evidence was misidentification. The defendant was either guilty of the offenses as charged or not guilty. The trial court properly refused the defendant's instructions on the lesser included offenses.

We next address the defendant's argument that only one act formed the basis for his convictions of home invasion and armed robbery and, therefore, his conviction of and sentence for armed robbery should be vacated. The defendant was convicted of home invasion based upon his alleged entry into Gwen's house and the use of force or threat of the imminent use of force against her while armed with a dangerous weapon. (Ill. Rev. Stat. 1987, ch. 38, par. 12—11(a)(1) (now codified, as amended, at 720 ILCS 5/12—11(a)(1) (West 1992)).) The defendant contends that the use of force or threat of imminent use of force had to consist of either the aggravated criminal sexual assault or the armed robbery. The defendant asks that his conviction of and sentence for armed robbery be vacated because that offense was carved from the same act as that resulting in his conviction of home invasion and, based upon the trial court's sentence, it was the least serious of the offenses of which he was convicted.

In *People v. King* (1977), 66 Ill. 2d 551, the supreme court set forth the standard by which we are to determine the propriety of multiple convictions and sentences:

> "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. *** 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566.

We hold that the use of force or threat of imminent use of force underlying the home invasion conviction was not carved from the aggravated criminal sexual assault or the armed robbery. Gwen's testimony revealed that when she first woke up on the night of the offense, the defendant was standing in her bedroom holding a nightstick. She asked him to leave, and he repeatedly told her to "shut up" or he would kill her. This threat of the imminent use of force was an act independent of the aggravated criminal sexual assault or the armed robbery. See *People v. Tate* (1982), 106 Ill. App. 3d 774 (the entry into the victim's home and the stabbing of the victim constituted separate acts which supported

convictions of home invasion and aggravated battery); *People v. Dixon* (1984), 122 Ill. App. 3d 141 (stepping one foot into the door and shooting the victim constituted separate acts which supported convictions of home invasion, burglary, and murder); *People v. Myers* (1981), 85 Ill. 2d 281 (there were two separate acts supporting convictions of attempted murder and armed violence based on aggravated battery where the defendant cut the victim's throat with a knife, took the knife off the victim's throat in order to menace another person, then put the knife back to the victim's throat and gave it a "pretty hefty yank").

Since we have determined that the defendant's multiple offenses did not arise out of the same act, and the defendant does not argue that he was convicted of any lesser included offenses, the multiple convictions and sentences can stand. See *King*, 66 Ill. 2d 551.

The defendant next challenges the propriety of his sentence. The State contends that the sentencing issues are waived because the defendant did not file a motion to reduce the sentences. We agree. See *People v. Hess* (1993), 241 Ill. App. 3d 276, 283.

The defendant asks us to review the cause on the basis of plain error. (134 Ill. 2d R. 615(a).) Based on the record before us, we do not find that any plain error requiring us to reduce the defendant's sentence has occurred. The trial judge is usually in a better position to determine the punishment to be imposed than the courts of review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) A reviewing court will not modify a sentence unless it clearly departs from the spirit and purpose of the constitutional requirement that the sentence be proportionate to the nature of the offense and that the possibilities for rehabilitation be taken into account. (*People v. Fort* (1992), 229 Ill. App. 3d 336, 340.) A sentence is presumptively proper, and a reviewing court will find an abuse of discretion only where that presumption has been rebutted by an affirmative showing of error. *Fort*, 229 Ill. App. 3d at 340.

The record in this case reveals that the trial judge considered the evidence in mitigation and aggravation. He also read the presentence report and the report prepared by Kevin & Associates dealing with the defendant's family background and his use of alcohol and drugs. The trial judge found that there were no statutory mitigating factors. However, he found several statutory factors in aggravation, including that "the defendant's conduct caused or threatened serious harm" to Gwen. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(1) (now codified, as amended, at 730 ILCS 5/5—5—3.2(a)(1) (West 1992)).) The defendant also had an extensive "history of prior delinquency or criminal activity" (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(3) (now codified, as amended, at 730 ILCS 5/5—5—3.2(a)(3) (West 1992))), including two bur-

glaries, theft, and possession of stolen vehicles. In addition, during his first term of incarceration in the Du Page County jail and his initial term of imprisonment in the Joliet Correctional Facility in 1988 and 1989, the defendant damaged property, started fires, and physically assaulted, battered, and threatened correctional officers.

The court also found as an aggravating factor that the defendant committed the felonies against Gwen while on probation for prior felonies. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(12) (now codified, as amended, at 730 ILCS 5/5—5—3.2(a)(12) (West 1992)).) Finally, the trial judge specifically commented upon the defendant's lack of remorse, which is a proper subject for consideration at sentencing. *People v. Albanese* (1984), 102 Ill. 2d 54, 80-81.

The defendant argues that the trial court failed to consider that he did not physically harm Gwen. The fact that a defendant's conduct "neither caused nor threatened serious physical harm to another" is recognized as a factor in mitigation. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.1(a)(1) (now 730 ILCS 5/5—5—3.1(a)(1) (West 1992)).) However, the aggravated criminal sexual assaults of which the defendant was found guilty, accompanied by threats that he would kill the victim if she resisted, at the very least threatened serious physical harm. See *People v. Burba* (1985), 134 Ill. App. 3d 228 (the attempted rape and deviate sexual assault of a 64-year-old woman with a fractured hip, accompanied by threats that he would break her arms if she resisted, at the very least threatened serious physical harm).

The defendant also argues that the court's sentence fails to acknowledge any possibility of rehabilitative potential and provides him with no realistic opportunities to become a productive citizen. The defendant contends that his rehabilitative potential is demonstrated by the fact that he earned his G.E.D. and attended 12 Alcoholics Anonymous meetings and 11 substance abuse classes during his second period of incarceration at the Du Page County jail in 1991. Further, Du Page County sheriff's deputies Patrick Leahy and David Lyons testified that the defendant's behavior was much improved from his behavior in 1988.

However, there was testimony that the defendant continued his violent behavior during his second period of incarceration. Sergeant James Hochhauser of the Du Page County sheriff's department testified that on October 5, 1991, the defendant threatened another inmate after the two had been involved in an altercation. Deputy Timothy Walsh also testified that on October 5, 1991, he gave the defendant a verbal warning for an earlier incident. The defendant became "verbally belligerent." When Walsh asked to see the defendant's wrist band in order to make a

positive identification, the defendant told him that he would "slap the shit" out of him.

In sentencing the defendant, the trial judge considered the seriousness of the offenses, the defendant's extensive criminal history, his lack of remorse, and the protection of society. In weighing the defendant's rehabilitative potential, the trial judge was not required to give greater weight to that consideration than to the seriousness of the offenses or the other aggravating factors. *People v. Brajcki* (1986), 150 Ill. App. 3d 506, 515.

We also note that section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a) (now codified, as amended, at 730 ILCS 5/5—8—4(a) (West 1992))) mandates *consecutive* sentences for offenses which were committed as part of a single course of conduct where one of the offenses of which the defendant was convicted was criminal sexual assault or aggravated criminal sexual assault. (See *People v. Bole* (1991), 223 Ill. App. 3d 247, *appeal allowed* (1991), 144 Ill. 2d 636.) In this case, the defendant held a club to the back of the victim's head and forced her to perform oral sex on him. He then immediately forced her to engage in vaginal sex. The defendant's separate acts of aggravated criminal sexual assault were committed as part of a single course of conduct, and pursuant to section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a) (now codified, as amended, at 730 ILCS 5/5—8—4(a) (West 1992))), the trial court was required to sentence him to consecutive sentences for those acts. The trial judge, though, sentenced the defendant to *concurrent* terms of 30 years' imprisonment for the two aggravated criminal sexual assault convictions. Thus, the sentence imposed by the trial judge erred *in favor* of the defendant. However, we find no plain error requiring us to reduce the defendant's sentence.

For the foregoing reasons, we affirm the trial court.

Affirmed.

BOWMAN and GEIGER, JJ., concur.