No. 2--04--0100                              filed:
6/28/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 01--CF--0268 |
| ERNEST E. GWINN, | ) ) ) | Honorable John T. Phillips, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BOWMAN delivered the opinion of the court:

Following a jury trial, defendant, Ernest E. Gwinn, was found guilty of home invasion (720 ILCS 5/12--11(a)(2) (West 2002)) and aggravated domestic battery (720 ILCS 5/12--3.3(a) (West 2002)). The trial court did not impose a sentence for aggravated domestic battery but sentenced defendant to 20 years' imprisonment for home invasion. On appeal, defendant argues that (1) he was not proven guilty beyond a reasonable doubt of home invasion; (2) the trial court erred by admitting evidence that defendant attempted to tamper with witnesses; (3) the victim's out-of-court statement to police was inadmissible hearsay; (4) the trial court erred by refusing to give two jury instructions; and (5) the home invasion statute was not intended to extend to the domestic arena. We affirm.

1

## I. BACKGROUND

Defendant was charged with three counts of home invasion and one count of aggravated domestic battery. Count I alleged that on July 18, 2002, defendant knowingly and without authority entered the dwelling place of Tanya Allen and intentionally injured her by striking her in the face. Count II alleged that defendant committed home invasion while armed with barber clippers, a dangerous weapon, and threatened the imminent use of force by stating that he was "going to beat" Allen. Count III alleged that defendant committed home invasion while armed with barber clippers and threatened the imminent use of force by swinging the barber clippers at Allen. Count IV alleged that defendant knowingly caused great bodily harm to Allen, a member of defendant's family or household, by striking her in the face with his fist.

### A. Other-Crimes Evidence

Trial was originally set for March 3, 2003, and a jury was selected. The parties and the court then discussed various motions, one of which was the State's motion to admit evidence of Western Union money transfers. According to the State, defendant was wiring money to Allen in order to influence her testimony. Defendant, under the assumed name "Aaron Daniels," was transferring money to a recipient named "Theresa Ausmer," who was Allen's sister. The court denied the State's motion to admit the Western Union records, finding that a "mini-trial" regarding those documents was not proper when they were not directly tied to defendant. However, the State was allowed to question Allen about receiving money from defendant. After the State filed a certificate of impairment and a notice of appeal, the trial court released the jurors, who had not been sworn.

With respect to the money transfers, defendant was arraigned on multiple charges of bribery, unlawful communication with a witness, and obstruction of justice, on March 31, 2003.

On May 28, 2003, the State advised the court that it had withdrawn the interlocutory appeal and that it wished to proceed with the home invasion and aggravated domestic battery charges before the witness-tampering charges.

On October 21, 2003, the State again sought to admit evidence of the Western Union wire transfers. Defendant filed a motion to clarify the trial court's March 2003 ruling denying the State's motion to introduce such evidence. The State filed a response and the court heard arguments on November 11, 2003. According to the State, Allen moved to Georgia after the home invasion and aggravated domestic battery offenses, and defendant wired her various amounts of money. The State argued that it was now able to tie defendant to the wire transfers based on the testimony of Danielle Hubbard, an eyewitness, and Joy Baker, defendant's former girlfriend. Specifically, Hubbard testified before the grand jury that defendant gave her $500 to encourage her to hide and to avoid testifying at his trial. According to the State, defendant, under the assumed name of Melvin Lewis, also planned to wire transfer another $500 to Hubbard around midnight on January 10, 2003. Defendant was arrested before wiring the additional $500, although Western Union forms listing Melvin Lewis as the sender were found in his possession. In addition, Baker testified before the grand jury that defendant had a stack of blank Western Union forms listing Aaron Daniels as the sender. Approximately 12 times, defendant gave Baker cash to wire to Allen, who was in Atlanta, although Ausmer was listed as the recipient on the forms. Allen received several thousand dollars from defendant during the period that his trial was

3

continued. Defendant continued to assert that the documents were not sufficiently tied to him. The court found that this testimony could tie defendant to the Western Union documents, rendering them admissible to show defendant's consciousness of guilt.

B. Trial Testimony

Trial commenced on November 17, 2003. Jose Nieves, a 911 operator, testified first on behalf of the State. On July 18, 2002, at 9:15 p.m., Nieves received a call from apartment 6 of 124 Drew Lane in Waukegan. He heard a woman screaming hysterically, but could not tell what she was saying. The jury was allowed to hear a tape recording of the conversation.

Waukegan police officer John Fong testified as follows. On July 18, 2002, he was the first officer to arrive at apartment 6 of 124 Drew Lane. Officer Fong knocked on the door and stated "Waukegan Police," but no one answered. A short time later, Officers Hall and Schultes and Sergeant Mullen arrived. Officer Fong then went outside and climbed onto the rear balcony to look into the apartment. He knocked on the patio door and saw an inside light go out. Officer Schultes was on the ground level facing the balcony while the other officers remained at the apartment door. There were no officers on the east side of the apartment building. After about 15 minutes, Allen opened the patio door. Officer Fong rushed into the apartment and opened the front door for the other officers. Inside, he saw a young boy and an infant, and he noticed that Allen was "crying," "trembling," and "visibly shaken up." In addition, there was blood on the bridge of her nose, and her left eye was swollen shut.

Officer Fong sat on the couch with Allen, who was "rocking a little bit" and clutching her infant. She said she had been punched. In a side-bar conference, defense counsel

made a hearsay objection to the testimony of Officer Fong's conversation with Allen, but the trial court found her statements admissible under the excited utterance exception. Allen told Officer Fong that defendant, the father of her children, had forced his way into her apartment and punched her in the face. Officer Fong did not recall seeing anyone run from the apartment building, nor did he recall seeing any damage to Allen's apartment door or the interior of her apartment.

Officer Montague Hall testified as follows. He reported to the scene of the domestic disturbance to cover other officers. For approximately 15 minutes, he and Sergeant Mullen waited outside Allen's apartment door while Officer Fong climbed onto the balcony. Officer Schultes was positioned on the ground by the balcony. None of the four officers investigating the incident were on the east or south side of the building. When Officer Fong opened the apartment door, Officer Hall and Sergeant Mullen searched the apartment and found Allen and her two children. Allen's young boy was excited, walking back and forth from the hallway to the living room. Detective Hall noticed that the window in the master bedroom was open and had no screen. The window, which was 4 feet by 3 feet, was on the east side of the building and about 8 to 10 feet above the ground. Detective Hall did not see any signs of forced entry or damage to the apartment.

Sergeant Anthony John Joseph testified as follows. He was assigned to investigate the incident that occurred on July 18, 2002. During the investigation, he learned that defendant lived at 1984 Eagle Ridge Drive in Waukegan. Defendant's residence was 18 blocks from Allen's apartment, approximately a 10-minute drive. Four days after the incident, Sergeant Joseph met with Allen and saw that her face was injured. Allen had two black eyes, her left eye was swollen shut, and she had a cut on the bridge of her nose.

Sergeant Joseph attempted to find witnesses in October 2002. He located an individual named Danielle Hubbard but was unable to find Allen. Eventually, he located Allen in an Atlanta suburb in February 2003.

Allen testified as follows. Allen, age 24, had two children with defendant: a boy (Taige), age four, and a girl (Tamaria), age two. In July 2002, she lived in apartment 6 at 124 Drew Lane in Waukegan. Her neighbor, Hubbard, lived in another apartment building across the street. On July 18, 2002, Hubbard was at Allen's apartment and they were all watching movies in Allen's bedroom. Allen denied that she heard the main-door buzzer ring in her apartment around 9 p.m. that night. Allen was impeached by her July 24, 2002, grand jury testimony, where she testified that the buzzer rang around 9 p.m. According to Allen's grand jury testimony, Taige went downstairs to the building entrance after hearing the buzzer and came up with defendant, whom Allen saw standing outside the apartment door. Contrary to her grand jury testimony, at trial Allen denied that Taige left the apartment or came up the stairs with defendant. A side-bar conference was held, and over defense counsel's objection, the court allowed the State to treat Allen as a hostile witness.

On July 24, 2002, which was six days after the incident, Allen testified before the grand jury as follows. On July 18, defendant tried to force open the door, while she was on the other side pushing the door closed. Allen told defendant not to come in "tripping" and acting crazy. She tried to keep the door closed, but defendant kept pushing on it until it eventually opened. Defendant told her to let him in and get away from the door, so she stepped back. Allen told defendant to leave and that she had company, meaning that Hubbard was still in her bedroom. Defendant refused to leave and searched the apartment. In the bedroom, defendant told Hubbard to leave because he was going to

6

"beat [Allen's] ass." Defendant was angry and his voice was raised. Allen then called 911, which made defendant angry and he punched her in the face with his fist. The force of the blow knocked her to the ground. Defendant was still in her apartment when the police arrived, and he told her not to open the door. Defendant told Allen that he was sorry and that he was going "to run." Defendant jumped out the bedroom window, and then Allen let the officers in through the sliding door to the balcony. Later, an ambulance took Allen to the hospital, where she told the triage nurse that her boyfriend had hit her.

At trial, Allen testified that her grand jury testimony on July 24 was incorrect. According to Allen, defendant was not at her apartment on July 18 and did not try to force his way in through the door. Although someone struck Allen and injured her face, she did not know who was responsible. Pictures of her injuries that were taken at the hospital were admitted into evidence.

After the incident, Allen took her children to Georgia and stayed with her sister, Ausmer. Although Allen testified that she did not maintain contact with defendant while in Georgia, she was again impeached with her February 5, 2003, grand jury testimony. At that time, Allen testified that defendant sent her money under the "made-up" name of Aaron Daniels. Contrary to her February 5 testimony, at trial Allen claimed that Aaron Daniels was the name of Ausmer's fiancé. At trial, she also denied calling defendant's sister to speak to defendant, denied being aware that defendant knew she was staying with her sister in Georgia, and denied receiving money from defendant while living in Georgia. According to Allen, the February 5 grand jury testimony did not reflect her words, but those of Sergeant Joseph.

7

On cross-examination, Allen testified that defendant had continuing permission to go to her apartment; he took the children to day care and paid her $200 per month for child support. Allen lied to the police about defendant punching her in the face because she had recently learned that defendant had a newborn child with another woman. Allen's anger at defendant caused her to lie before the grand jury on July 24, 2002, and on February 5, 2003.

According to Allen, on July 18, she went outside to throw a bag into the garbage can when she was struck in the face. She fell to the ground, got up, and ran back into her apartment. Although she did not know who struck her, she told Hubbard that she thought it was defendant because they had argued earlier that day. Allen instructed Hubbard to tell the police that defendant had been in her apartment that night, to make the story more believable. Hubbard went home because she did not want to get involved. Allen opened the bedroom window to support her story and told the police where defendant lived.

On August 7, 2002, Allen told Daniel Haxton, a private investigator hired by the defense, her current version of events. In addition, she saw Sergeant Joseph at McDonald's and tried to tell him about her changed story. In August 2002, Allen went to school in Atlanta and stayed with her sister. Sergeant Joseph and another investigator then brought her back to Illinois to testify with respect to the witness-tampering investigation. Her testimony on February 5, 2003, was based on police threats and was not true.

Joy Baker testified as follows. In August 2002, she moved into an apartment with defendant. Defendant told Baker that he was going to meet with Allen's father and give him money to move Allen to Atlanta so that the "court stuff could kind of die down." Defendant

met with Allen's father more than once and gave him $5,000. In addition, defendant and Baker met with Hubbard one night in a parking lot. Defendant asked Hubbard if she could leave town for a week so that the "court thing [could] die down." Defendant handed Hubbard a roll of cash and told her that he would take care of her job, rent, and car payments.

In October 2002, Baker sent money to Allen using Western Union money transfers. Defendant filled out the forms and gave Baker the money to send to Allen, which Baker would do on her way to work. None of the forms listed defendant as the sender or Allen as the recipient. On January 10, 2003, defendant and Baker went to Western Union to send money to Allen and Hubbard. After Baker sent money to Allen, defendant told her to go back inside the Western Union and see how much it would cost to send $500 to Hubbard. They were unable to send the money that day. Baker left defendant in February 2003. The parties subsequently stipulated that on January 10, 2003, defendant possessed a Western Union form and $500 cash.

The court provided a limiting instruction to the jury that evidence of defendant's other conduct was limited to his intent and consciousness of guilt.

Western Union compliance officer Don Rigby testified as follows. To send money via Western Union, the sender fills out a send form with his name, address, and phone number. No identification is required when the amount sent is less than $1,000. Regarding the time period from October 2002 to February 2003, Rigby located several money transfers listing Aaron Daniels as sender and Theresa Ausmer as receiver. The money was sent from Waukegan, Illinois, to a suburb of Atlanta.

9

Hubbard testified as follows. On July 18, 2002, she went to Allen's apartment after dinner. At some point, Allen went outside to throw a diaper in the garbage. When she returned to the apartment, there was nothing unusual about her appearance and she did not say that she had been struck while outside. A few minutes later, the doorbell rang and Allen went out to the hall to look through the window of the building's front security door. Allen came back into the apartment and said that defendant was at the door. The court admonished the jury that Hubbard's statement was not allowed for its truth, but to show the circumstances of her conduct and to explain what she knew.

Everyone was in the bedroom when defendant entered. At first, defendant talked to Allen, and then began yelling at her while holding barber clippers. With the cord wrapped around his hand, he swung the clippers at Allen but missed her because she ducked. The clippers broke away from the cord and put a gash in the wall. Defendant then told Hubbard to leave, grabbed her by the wrist, and led her to the door. Although Hubbard resisted, defendant managed to get her out of the bedroom. Allen yelled for Hubbard to call the police, and Hubbard told defendant that she needed to go back in the bedroom to get her keys. Allen made it to the apartment's front door, but defendant pulled her back by her hair and pushed her into a corner. Defendant told Hubbard not to call the police because he was just going to talk to Allen. Allen yelled to call the police and defendant hit Allen in the left eye with his fist. Allen "hollered out," grabbed her eye, and dropped to the floor. After defendant punched Allen, Hubbard got out of the apartment and went to Allen's aunt's apartment, which was in the next building. Allen's aunt called 911.

A few weeks later, in late July or early August 2002, Allen told Hubbard that she was going to change her story. Now, Allen was going to say that someone hit her when she

went outside to throw away the diaper, but she did not know who. Allen asked what Hubbard wanted in exchange for changing her story as well. In addition, sometime in September 2002, defendant talked to Hubbard on the phone and said that he would give her whatever she wanted in exchange for her cooperation and that Allen had already changed her story. In October 2002, Hubbard agreed to change her story[1] because defendant was becoming persistent, and because Allen had left town. Defendant said that investigator Haxton would tape her new story, which he did on October 7, 2002. On October 8, Hubbard met with defendant in a parking lot. Defendant told Hubbard that she would not be able to go back to work and that she was to leave until the trial was over. Defendant gave Hubbard $500, and she took it and left town. On January 10, 2003, defendant told Hubbard over the phone that he was worried because he had not heard from her and that he would wire money to whatever name she provided him. Hubbard called defendant back to say that she did not want any money.

Baker's mother, Yvette Baker, testified as follows. On November 8, 2003, Yvette received a call from defendant saying that he did not want Baker to testify and that Baker could keep the money. Yvette ended the call, and from 9:24 to 9:30 p.m., Yvette's phone

---

[1]The record contains Hubbard's testimony before the grand jury on July 24, 2002, in which she testified that defendant punched Allen in the face.

rang six more times. The trial court again admonished the jury that its consideration of evidence of other conduct was limited to defendant's intent and consciousness of guilt. The parties stipulated that defendant was in possession of Yvette's phone number.

After the State rested, defense counsel moved for a directed verdict on all four counts. The court denied the motion, finding that a rational jury could find the elements of home invasion and aggravated domestic battery, based on the substantive use of the grand jury testimony.

Senior probation officer Estralita Jones testified first on behalf of the defense. Jones was defendant's pretrial bond service officer on July 18, 2002. At approximately 8:24 p.m. on July 18, Jones performed a routine checkup by calling defendant on his home telephone. Defendant answered, and the call lasted only a couple of seconds. Jones could not say where defendant was after 8:24 p.m.

Sandie Duffie, Allen's father, testified as follows. On July 18, he went to Allen's apartment and observed police and squad cars in the parking lot. Police were questioning Allen when he entered the apartment. Allen's face was bruised as if she had been beaten, and she was confused and disoriented. There was no sign of forced entry through the apartment door. Duffie was with Allen when she met with investigator Haxton on August 7, 2002, and her demeanor during that interview was fine. She was not disoriented and knew what she was saying and doing. Duffie denied receiving $5,000 from defendant. Allen went to Atlanta to go to school, and she stayed with her sister Ausmer, who lives there. Allen's mother, Madeline Duffie, testified that Allen was injured when she saw her daughter on July 18, 2002.

Venus Kindle testified that she lived with defendant and their infant daughter on July 18, 2002. According to Kindle, she and defendant had dinner around 6:30 p.m., defendant bathed the baby, and they watched television. Defendant did not leave the house that night. Around 10 p.m., defendant's sister called to say that the police were looking for defendant. The police never contacted Kindle in regard to the incident.

Defendant's sister, Nicole Gwinn, testified as follows. On July 18, 2002, around 9 p.m., she returned to the home she shared with her mother. Police in squad cars followed her as she parked, asked her if defendant was inside her house, and searched her home. After they left, she called defendant at home to tell him that the police were looking for him. Defendant answered the phone.

Defendant's mother, Josephine Gwinn, came home around 10 p.m. on July 18. Nicole explained that the police had searched the house and just left, and Josephine called defendant at home and talked to him.

Defendant testified as follows. He denied being at Allen's apartment and denied all conduct in connection with the incident. Defendant had a key to Allen's apartment and had permission to take their two children to day care. Defendant was a licensed barber who owned about 20 barber clippers. When defendant had work, he would pay Allen $200 per month in child support. While Allen was in Atlanta, defendant did not make payments directly to her because there was a no-contact order in place. Instead, he would make payments to Ausmer under the name of Ausmer's fiancé, Aaron Daniels. He also sent money under the name Robert Taylor. Defendant denied meeting Hubbard on October 8, 2002, and trying to pay her. The court admonished the jury that evidence of other conduct was limited to defendant's intent and guilty knowledge.

13

On July 18, defendant was at home with Kindle and their baby, and Jones called him for a routine check. In August 2002, Kindle moved in with her parents and defendant moved in with his sister. Baker was a friend whom he helped out by letting her use his address. Baker left in February 2003 because they had a falling out; defendant did not know where she went. Defendant found Baker's mother's phone number and called her on November 8, 2003. He called to plead with Yvette to not let Baker "lie on [him]" about false charges; he was not calling to prevent Baker from testifying.

On rebuttal, Sergeant Joseph testified as follows. When investigating the incident on July 18, he spoke with Madeline, Allen's mother, who said that she had seen defendant's green, four-door Plymouth Breeze parked behind Allen's apartment. Sergeant Joseph asked Madeline how she knew that the car belonged to defendant, and she replied that she had seen defendant drive it on numerous occasions and that she had purchased the child seat in the car. The trial court admonished the jury that this evidence could be considered only for the limited purpose of showing inconsistent statements by a witness.

The State also recalled Yvette, who testified regarding the phone calls she received on November 8, 2003. Over objection, the jury heard an audiotape of the voice mail messages that Yvette received that night. The trial court admonished the jury about evidence of defendant's other conduct and about inconsistent statements.

During the jury instruction conference, defense counsel sought an accomplice instruction and an instruction on criminal trespass, as a lesser offense of home invasion. The court refused the tendered instructions.

The jury found defendant guilty of one count of home invasion (causing injury) and aggravated domestic battery. Defendant filed a posttrial motion, which the trial court

14

denied. At the sentencing hearing, the State pointed out that the court should not sentence defendant on both charges because, under the one-act, one-crime rule, the aggravated domestic battery offense merged into the home invasion offense. See People v. King, 66 Ill. 2d 551 (1977). The trial court agreed and did not enter a conviction or impose a sentence for aggravated domestic battery. Defendant was sentenced to 20 years' imprisonment for home invasion. Defendant timely appealed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant first argues that he was not proven guilty beyond a reasonable doubt of home invasion because the only evidence against him was unreliable. According to defendant, Allen recanted her grand jury testimony and attempted to tell the truth at trial by explaining that she had fabricated a story against defendant to punish him for leaving her. Defendant also argues that Hubbard recanted her grand jury testimony when she was interviewed by investigator Haxton. The State counters that the jury was in the best position to evaluate the witnesses' testimony in light of the various inconsistencies and to determine which version was more credible. The State further argues that there was other evidence supporting defendant's conviction. We agree with the State.

To sustain a conviction of home invasion, the State must prove that defendant entered Allen's dwelling without authority and intentionally caused her injury. See 720 ILCS 5/12--11(a)(2) (West 2002). In assessing a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Cunningham, 212 Ill. 2d 274, 278 (2004). We must

15

view the evidence in the light most favorable to the prosecution, which means that we must allow all reasonable inferences from the record in favor of the prosecution. Cunningham, 212 Ill. 2d at 280. "A criminal conviction will not be set aside unless the evidence is so unsatisfactory as to create a reasonable doubt regarding the defendant's guilt." People v. Dryden, 363 Ill. App. 3d 447, 450 (2006). As we carefully examine the record evidence, we must not retry the defendant and must keep in mind that it was the fact finder who saw and heard the witnesses. Cunningham, 212 Ill. 2d at 279-80.

At trial, Allen denied that defendant forced his way into her apartment and struck her in the face with his fist. This testimony was contrary to her testimony before the grand jury, given only six days after the incident, where she stated that defendant forced his way through the door and punched her in the face. Allen's grand jury testimony, which was admitted as substantive evidence pursuant to section 115--10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115--10.1 (West 2002)), was as follows. On July 18, defendant tried to force open the door. Although Allen tried to keep the door closed, defendant kept pushing on it until it eventually opened. Allen told defendant to leave and that she had company, meaning that Hubbard was still in her bedroom. Defendant refused to leave and told Hubbard that he was going to "beat [Allen's] ass." Allen then called 911, which made defendant angry. Defendant punched Allen in the face and the force of the blow knocked her to the ground. Defendant was still in her apartment when the police arrived, and he told her not to open the door. Defendant told Allen that he was going "to run," and he jumped out the bedroom window. Significantly, Hubbard's grand jury testimony and trial testimony were consistent with Allen's grand jury testimony.

Corroborating Allen's original account of the incident, Hubbard, the other eyewitness, testified that defendant hit Allen in the left eye with his fist, causing her to drop to the floor.

With respect to defendant's claim that Allen testified truthfully at trial, it is evident that the jury found her grand jury testimony implicating defendant more credible than her trial testimony. See People v. Logan, 352 Ill. App. 3d 73, 79-80 (2004) (even though eyewitness recanted at trial her grand jury testimony that she saw the defendant shoot the victim, the jury obviously found her grand jury testimony more credible than her trial testimony); see also People v. Thomas, 354 Ill. App. 3d 868, 882 (2004) (accomplice's statements from his own trial that implicated the defendant, which he recanted at the defendant's trial, could lead a rational jury to conclude that the accomplice told the truth at his own trial but lied at the defendant's trial). In addition, Hubbard's trial testimony supported the conclusion that Allen was not testifying truthfully. According to Hubbard, Allen had decided to change her story and wanted Hubbard to change her story as well. Hubbard even testified as to the details of Allen's changed story, which was that some unidentified individual struck Allen while she was outside.

While defendant argues that Hubbard's trial testimony was unreliable because she gave a different statement when interviewed by investigator Haxton, Hubbard testified that she changed her story because both defendant and Allen pressured her to do so, because defendant became persistent, and because Allen had left town. Again, it was up to the jury to resolve any inconsistencies in Hubbard's testimony, and the trier of fact is free to accept or reject as much or as little as it pleases of a witness's testimony. Logan, 352 Ill. App. 3d at 80-81. Considering her testimony in the light most favorable to the State, a rational jury could conclude that Hubbard's trial testimony implicating defendant and explaining Allen's

17

changed story was true.  See <u>Cunningham</u>, 212 Ill. 2d at 279 (where a finding of guilt depends on eyewitness testimony, we must decide whether, in light of the record, a trier of fact could reasonably accept the testimony as true beyond a reasonable doubt).  In weighing the statements of Allen and Hubbard, the jury resolved the inconsistencies in favor of the State, and we find no reason to substitute our judgment for that of the jury.

We also note that, contrary to defendant's assertion, there was other evidence before the jury to support defendant's conviction.  For example, as we discuss later, Officer Fong properly testified regarding his conversation with Allen directly after the incident.  Officer Fong's testimony matched Allen's grand jury testimony and Hubbard's trial testimony in that Allen told him that defendant had forced his way into her apartment and punched her in the face.  As the State points out, the jury also heard evidence that defendant went to great lengths to prevent Allen and Hubbard, as well as other witnesses, from testifying against him.  While we discuss this other-crimes evidence in more detail below, the evidence supported Allen's original account that defendant forced his way into her apartment and struck her.  In sum, after considering all of the evidence in the light most favorable to the prosecution, the jury could reasonably conclude beyond a reasonable doubt that defendant committed the offense of home invasion.

## B. Other-Crimes Evidence

Defendant next argues that the trial court erred by admitting evidence that he bribed a witness as showing consciousness of guilt.  According to defendant, while the evidence showed that he regularly supported his children financially, it failed to raise more than a mere suspicion that he was involved in witness tampering.  Defendant maintains that admission of this overly prejudicial evidence requires reversal.  The State responds that

defendant attempted to fix the trial by bribing witnesses not to testify against him, that this evidence was relevant to show his consciousness of guilt, and that the trial court carefully instructed the jury on the limited purpose of this evidence.

Evidence of "other crimes" is inadmissible to show a defendant's propensity to commit a crime. People v. Hawkins, 326 Ill. App. 3d 992, 997 (2001). Such evidence is prejudicial because a jury might convict the defendant because it believes that the defendant is a bad person and deserves punishment. People v. Tolbert, 323 Ill. App. 3d 793, 796 (2001). Other-crimes evidence is admissible, however, if it is relevant for a purpose other than to show the defendant's disposition or propensity to commit a crime. People v. Bedoya, 325 Ill. App. 3d 926, 937 (2001). Examples of relevant purpose include modus operandi, motive, intent, identity, absence of mistake (Bedoya, 325 Ill. App. 3d at 937), and consciousness of guilt (People v. Boand, 362 Ill. App. 3d 106, 124 (2005)). This list is not exclusive, and evidence is relevant if it has any tendency to make the existence of a fact that is of consequence in the case more probable or less probable than it would be without the evidence. Bedoya, 325 Ill. App. 3d at 937.

When the trial court finds some relevance in other-crimes evidence, it must then conduct a balancing test. Bedoya, 325 Ill. App. 3d at 937. Evidence of other crimes is admissible only if its probative value outweighs the risk of unfair prejudice to the defendant. Boand, 362 Ill. App. 3d at 125. "However, before such evidence is admitted, the State must first show that a crime took place and that the defendant committed it or participated in its commission." (Emphasis omitted.) People v. Thingvold, 145 Ill. 2d 441, 455 (1991). Proof that the defendant committed the crime, or participated in its commission, need not be beyond a reasonable doubt, but it must be more than a mere suspicion. Thingvold, 145

19

Ill. 2d at 456; see also <u>Bedoya</u>, 325 Ill. App. 3d at 938 (the standard for admissibility of other crimes has not been clearly established in Illinois; it is more than mere suspicion, but less than beyond a reasonable doubt). It is within the trial court's discretion to determine whether the evidence of other crimes is relevant to a material issue and whether the probative value outweighs its prejudicial impact. <u>Tolbert</u>, 323 Ill. App. 3d at 797. We will not reverse a trial court's ruling as to the admissibility of such evidence absent an abuse of discretion, which occurs when the court's decision is arbitrary, fanciful, or unreasonable. <u>Tolbert</u>, 323 Ill. App. 3d at 797.

We determine that the trial court properly admitted evidence of witness tampering. First, we disagree with defendant's assertion that the money he wired to Allen failed to raise more than a mere suspicion that he was attempting to bribe her. See <u>Hawkins</u>, 326 Ill. App. 3d at 998 (because evidence that the defendant had attempted to bribe the trial judge during his murder trial was not ambiguous but strong and overwhelming, it was admissible to show the defendant's consciousness of guilt). At trial, defendant admitted that he wired money to Allen via Western Union but listed Ausmer as the recipient. Defendant also admitted that he did not send the money under his own name, but under assumed names such as Aaron Daniels and Robert Taylor. While defendant testified that Aaron Daniels was the name of Ausmer's fiancé, this explanation conflicted with Allen's testimony before the grand jury on February 5, 2003, where she testified that Aaron Daniels was a "made-up" name defendant used to send her money. Western Union compliance officer Rigby confirmed that he located several money transfers listing Aaron Daniels as sender and Theresa Ausmer as receiver, and these records were admitted into evidence.

Second, in asserting that the money he sent to Allen was for child support, defendant fails to explain his attempts to influence other witnesses. At trial, Baker testified that defendant not only had her send money to Allen, but that he also met with Allen's father and gave him $5,000 to move Allen to Atlanta. See People v. Gacho, 122 Ill. 2d 221, 247 (1988) (letters written by the defendant asking the State's principal witness to leave town and stay with her sister until after his trial were relevant to show the defendant's consciousness of guilt). In addition, Baker testified that she and defendant met with Hubbard and gave her a roll of cash in exchange for Hubbard leaving town until the "court thing die[d] down." Hubbard similarly testified that, as a result of defendant's persistence, she eventually met with him and agreed to change her story and leave town in exchange for $500. Both Baker and Hubbard confirmed that defendant wanted to wire Hubbard money on January 10, 2003, and the parties stipulated that defendant possessed a Western Union form and $500 on that date. In addition, Baker's mother testified that defendant called her repeatedly, saying that Baker could keep the money and that he did not want Baker to testify.

Finally, we note that the court carefully limited the evidence of witness tampering, repeatedly instructing the jury that the purpose of admitting the bribery evidence related only to defendant's intent and consciousness of guilt. See People v. Aleman, 313 Ill. App. 3d 51, 65 (2000) (evidence of the bribe was properly admitted where the trial court explicitly instructed the jury that the purpose of the bribery evidence related only to the defendant's consciousness of guilt and his relationships with other witnesses). In this case, the evidence of witness tampering, although prejudicial, was clearly probative and relevant to

show defendant's intent and consciousness of guilt. Accordingly, the trial court did not abuse its discretion in admitting such evidence.

### C. Excited Utterance Exception to Hearsay Rule

Defendant next argues that the trial court abused its discretion by allowing Officer Fong to testify as to Allen's hearsay statement after the incident. According to defendant, the 15 to 20 minutes between the incident and the statement allowed Allen time to fabricate a story implicating defendant, which is contrary to the purpose of the excited utterance exception. The State maintains that the trial court correctly determined that the time period was short enough for Allen to still be under the effects of what had occurred, and that Allen's physical and mental state after the incident support the court's finding. We agree with the State.

Three factors have been deemed necessary to lay the foundation for the admission of a statement under the excited utterance exception to the hearsay rule. People v. Georgakapoulos, 303 Ill. App. 3d 1001, 1012 (1999). They are: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) an absence of time to fabricate; and (3) a relation of the statement to the circumstances of the occurrence. People v. Williams, 193 Ill. 2d 306, 352 (2000). In determining whether a hearsay statement is admissible under this exception, courts use a totality of the circumstances analysis. Williams, 193 Ill. 2d at 352. "This analysis involves the consideration of several factors, including time, 'the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest.' " Williams, 193 Ill. 2d at 352, quoting People v. House, 141 Ill. 2d 323, 382 (1990). No one factor is determinative, as each case must rest on its own facts. Georgakapoulos, 303 Ill.

App. 3d at 1012. Whether a statement qualifies as an excited utterance is within the trial court's discretion. Georgakapoulos, 303 Ill. App. 3d at 1012.

In this case, Officer Fong testified that approximately 15 minutes after police knocked on Allen's door, Allen opened the patio door. Officer Fong rushed into the apartment and opened the front door for the other officers. Officer Fong then sat on the couch with Allen, who was "rocking a little bit" and clutching her infant. Allen told Officer Fong that she had been punched in the face by defendant, the father of her children, who had forced his way into her apartment. We note that even if Allen's statement was in response to a question Officer Fong posed, the fact that a statement is made in response to a question does not necessarily destroy spontaneity. Williams, 193 Ill. 2d at 353; see also Georgakapoulos, 303 Ill. App. 3d at 1014 (the fact that a statement is made in response to the single question "what happened" has been held not to destroy spontaneity). According to Officer Fong, Allen was crying, trembling, and visibly shaken. In addition, there was blood on the bridge of her nose, and her left eye was swollen shut.

Given the above circumstances, defendant's argument that Allen fabricated a story between the time of the incident and the time of the statement is unpersuasive. As our supreme court has stated, "[t]he time factor has been described as an 'elusive' factor, 'whose significance will vary with the facts of each case.' " Williams, 193 Ill. 2d at 353, quoting House, 141 Ill. 2d at 382. Indeed, the period of time that may pass without affecting the admissibility of a statement under this exception varies greatly. See Williams, 193 Ill. 2d at 353 (a statement made 6½ hours after the occurrence was admissible although a statement made 20 minutes after the occurrence was properly excluded). The question we ask is whether the statement was made while the excitement of the event

predominated. People v. Smith, 152 Ill. 2d 229, 260 (1992). Although approximately 15 minutes passed before Allen opened the door, she made the statement to Officer Fong shortly after he entered her apartment and while she was still under the shock of the event. See People v. Smith, 127 Ill. App. 3d 622, 628 (1984) (the mental state of the declarant, in light of whether the declarant is injured or crying, very nervous or upset, or in great pain, is a factor to be considered). Here, Allen was "rocking" on the couch, crying, trembling, visibly shaken, and noticeably injured and in pain at the time she made the statement. Considering the totality of the circumstances, we cannot say that the trial court abused its discretion in finding that Allen's statement was admissible as an excited utterance.

### D. Jury Instructions

### 1. Criminal Trespass to a Residence

Defendant next argues that the trial court erred by refusing to give a jury instruction on the lesser-included offense of criminal trespass to a residence. As previously stated, defendant was charged with three counts of home invasion. Count I alleged that defendant knowingly and without authority entered Allen's dwelling place and intentionally caused her injury by striking her in the face. Count II alleged that defendant committed home invasion while armed with a dangerous weapon, barber clippers, and threatened the imminent use of force by stating that he was going to beat Allen. Count III alleged that defendant committed home invasion while armed with barber clippers and threatened the imminent use of force by swinging the barber clippers at Allen. At the jury instruction conference, defense counsel argued that an instruction on criminal trespass should be given along with each instruction on home invasion. Defense counsel argued that the jury could find defendant guilty of criminal trespass to a residence, which is committed when a person knowingly

24

enters or remains within a residence without authority (720 ILCS 5/19--4(a) (West 2002)), but not home invasion.  The State responded that an instruction on criminal trespass could result in inconsistent verdicts, because the jury could find defendant guilty on the first count of home invasion (causing injury) but also find defendant guilty of criminal trespass rather than home invasion on the remaining counts.  The court refused to instruct the jury on criminal trespass to a residence, finding that that lesser offense was not raised by the evidence presented at trial.

"The purpose of an instruction on a lesser offense is to provide 'an important third option to a jury which, believing that the defendant is guilty of something but uncertain whether the charged offense has been proved, might otherwise convict rather than acquit the defendant of the greater offense.' " People v. Hamilton, 179 Ill. 2d 319, 323-24 (1997), quoting People v. Bryant, 113 Ill. 2d 497, 502 (1986).  However, although criminal trespass to a residence is a lesser-included offense of home invasion, it does not automatically follow that a jury must be instructed on the lesser offense.  See Hamilton, 179 Ill. 2d at 324.  "A defendant is entitled to a lesser included offense instruction only if an examination of the evidence reveals that it would permit a jury to rationally find the defendant guilty of the lesser offense yet acquit the defendant of the greater offense."   (Emphasis added.) Hamilton, 179 Ill. 2d at 324.  In addition, where the evidence shows that a defendant is either guilty of the more severe offense or not guilty of any offense, an instruction on the lesser-included offense is unnecessary and properly refused.  People v. Austin, 216 Ill. App. 3d 913, 917 (1991).

In this case, the trial court properly refused to instruct the jury on the lesser-included offense of criminal trespass.  Based on the evidence, the jury could not have rationally

25

convicted defendant of criminal trespass and acquitted him of home invasion. In other words, if the jury acquitted defendant of home invasion, it could not find him guilty of criminal trespass. At trial, Hubbard testified that she saw defendant in Allen's apartment swinging barber clippers, yelling, grabbing Allen's hair, and punching her. Officer Fong testified that Allen told him that defendant had punched her in the face. Conversely, defendant's defense was that he never entered Allen's apartment on the night of the incident and was not involved in the incident. Both defendant and Kindle testified that defendant was home all night. As a result, the evidence showed either that defendant was at his apartment or that he committed one or more counts of home invasion as charged by the State. As the State points out, neither version would support a guilty verdict for criminal trespass and an acquittal for home invasion. See People v. Gagliani, 251 Ill. App. 3d 1019, 1026 (1993) (the defendant was either guilty of the offenses as charged or not guilty altogether; thus the trial court properly refused the defendant's instructions on the lesser-included offenses). Accordingly, the trial court properly refused defendant's instruction on the lesser-included offense of criminal trespass to a residence.

2. Accomplice Testimony

Defendant also argues that the trial court erred by refusing to give an instruction on accomplice testimony in regard to Baker's testimony. According to defendant, Baker was his accomplice in the commission of a crime because she assisted him in bribing a witness. The State counters that Baker was not an accomplice in the charged offenses.

The accomplice-witness jury instruction should be given if the totality of the evidence and the reasonable inferences that can be drawn from the evidence establish probable cause to believe that a witness participated in the commission of a crime. People v.

26

Campbell, 275 Ill. App. 3d 993, 997 (1995).  The Illinois Pattern Jury Instructions state, "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution.  It should be carefully examined in light of the other evidence in the case."  Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000).  Where the witness, rather than the defendant, could have been the person responsible for the crime, the defendant is entitled to have the pattern accomplice-witness jury instruction given.  Campbell, 275 Ill. App. 3d at 997.  In other words, if a witness could have been indicted either as a principal or under a theory of accountability, or if the witness admits presence at the scene of the crime, a defendant is entitled to an accomplice-witness instruction.  Campbell, 275 Ill. App. 3d at 997.

As the trial court found, Baker was not an accomplice in the charged offenses of home invasion and aggravated domestic battery.  At trial, Baker's testimony in no way suggested that she was involved in the incident at Allen's apartment on July 18.  Rather, her testimony related to sending money via Western Union on forms prepared by defendant, as well as her presence at a meeting between defendant and Hubbard.  This evidence was offered for the limited purpose of showing defendant's intent and consciousness of guilt.  Even with respect to the witness-tampering charges that were then pending against defendant, the trial court determined that Baker could not be charged as a principal or under a theory of accountability in that case.  Because there was no evidence suggesting that anyone acted as an accomplice to the charged offenses, the trial court properly refused to give the jury the accomplice-witness instruction.

E. Aggravated Domestic Battery

We note that defendant raises several issues regarding the guilty verdict for aggravated domestic battery. While defendant claims that a judgment of conviction was entered on the aggravated domestic battery charge, and that his contentions of error are properly before this court, this is not accurate. As the State points out, the trial court did not enter a conviction or impose a sentence on the aggravated domestic battery verdict. Rather, the aggravated domestic battery offense merged into the home invasion offense under the one-act, one-crime rule. Consequently, defendant is barred from challenging that verdict on appeal. See People v. Eure, 140 Ill. App. 3d 387, 397 (1986) (since no judgment of conviction was entered on the aggravated battery charges, nor was there any sentence imposed for either offense, the defendant was barred from challenging findings of guilt).

### F. Home Invasion Conviction

Defendant's final argument on appeal is that his conviction of home invasion should be reversed because that statute was not intended to apply to domestic disputes. First, we note that this issue is waived, as defendant never raised it below. See People v. Enoch, 122 Ill. 2d 176, 186 (1988). Even if the issue were not waived, however, it is meritless. In People v. Oakley, 187 Ill. 2d 472 (1999), our supreme court considered the validity of a home invasion conviction where the defendant's interest in the former marital residence had been extinguished by a final order in the divorce proceeding. Oakley, 187 Ill. 2d at 480. Because the defendant's ex-wife was awarded the house and the defendant retained no interest therein, the supreme court held that the defendant had entered the "dwelling place of another" for the purposes of the home-invasion statute. Oakley, 187 Ill. 2d at 480.

The facts here present an even stronger case for finding defendant guilty of home invasion. In this case, defendant and Allen were not married, nothing in the record

indicates that he was named on her lease, he had vacated the premises months earlier, and his authority to enter the premises was limited to taking the children to day care. Stated simply, nothing in this case implicates the legislature's concern that a party to a domestic dispute would be charged under the home-invasion statute for conduct committed in his own home. See Oakley, 187 Ill. 2d at 479. Thus, defendant committed home invasion when he entered Allen's apartment and his argument necessarily fails.

### III. CONCLUSION

For the reasons stated, the Lake County circuit court's judgment is affirmed.

Affirmed.

HUTCHINSON and O'MALLEY, JJ., concur.